CSK
F. #2004 R01164

UNITE D STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA
     - against -                              08 CR 466 (ILG)

EDWARD VAYSMAN,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S  SENTENCING MEMORANDUM OF LAW

 

                                      BENTON J. CAMPBELL
                                      United States Attorney
                                      Eastern District of New York
                                      One Pierrepont Plaza
                                      Brooklyn, New York  11201

 

CHARLES S. KLEINBERG
Assistant U.S. Attorney
        of Counsel

PRELIMINARY STATEMENT

The government submits this sentencing memorandum of law in opposition to the defendant's sentencing memorandum of law (" Br"of "Defendant's Brief") and in support of its position that the defendant should receive a guideline sentence as a level 26 offender.  The Probation Department accurately computed the defendant's guideline level as 26.  PSR ¶23.  The defendant, in his brief, misstates the facts, the law and the most basic principles of underwriting in order to avoid probation's correct calculation of his offense level as 26 and to argue instead for a guideline level of 16.  Indeed, the defendant even goes so far as to contradict his guilty plea by arguing that when he defrauded four different insurance companies into issuing to him $ 32 million of insurance on the life of his wife's elderly and totally penniless grandmother, he neither caused nor intended to cause any loss whatsoever to these insurance companies .   As shown below, the defendant is mistaken in arguing that he should  be sentenced as a level 16 offender for his very serious crimes.

STATEMENT OF FACTS

**A.   The Indictment**

The defendant was charged in a twenty-one count indictment with three types of crimes: (1) defrauding five different former property owners out of surplus money owed to them by the City of New York by falsely stating to the City that he was authorized to collect the surplus money on behalf of these former owners, when, in fact, he was not (the "Surplus Money Fraud") (Counts One through Five): (2) defrauding four different insurance companies into issuing to him over $32 million of life insurance on the life of his wife's elderly grandmother (the "insurance policies") , Helena Eckstein,  by making false statements to the companies, including false statements that grossly overstated Eckstein's  net worth as being over $32 million, which caused  the insurance companies to issue to the defendant the insurance policies that the insurance companies would not have issued if they had known the truth (the "Insurance Fraud") (Counts Six through Twenty); and (3) money laundering  by using the proceeds of the

1

Surplus Money Fraud to commit the Insurance Fraud (the "Money Laundering") (Count Twenty-One).

B. The Plea Agreement and the Guilty Plea

   In the Plea Agreement that the defendant entered into with the government, the defendant agreed to: (1)  plead guilty to Count Six of the Indictment (a count charging that he committed the Insurance Fraud against New York Life Insurance Company); (2) admit to committing the conduct charged in Counts One through Five and Seven through Twenty (each of the other Insurance Fraud  counts and each of the Five Surplus Money Fraud counts);  and (3) stipulate that the nineteen counts to which he was admitting, but not pleading,,  constitute relevant conduct for the purposes of sentencing him.  Plea Agreement ¶¶ 1- 2. (Exhibit 1[1/])

   At the defendant's guilty plea, the Court carefully reviewed with the defendant all of the language in Counts One through Twenty (Tr 4-13).  When the defendant's counsel pointed out that the defendant was only pleading to Count Six, the Court responded that it was reading all of the language in Counts One through Twenty to the defendant because "there is a provision in the plea agreement that you're admitting all of the conduct referred to in Counts One through Twenty" (Tr  9).  The defendant agreed that he had discussed the entire indictment with his attorney (Tr 13), that he understood and had agreed to all of the terms of the plea agreement and that he had entered into the plea agreement voluntarily (Tr 20-21).

   The defendant then pleaded guilty to Count Six, admitting that "on October 25, 2005, a premium notice was sent by New York Life Insurance Company to the [life insurance] trust [account of his wife's grandmother] . . . in connection with"  the fact that he "did knowingly and intentionally devise a scheme to defraud the insurance company with respect to life insurance policies on the life of [Eckstein]" (Tr 21-22).   When the Court asked the defendant if he admitted to committing all of the conduct in Counts One through Twenty and whether that conduct was relevant conduct to Count Six, the defendant's counsel stated that "we do admit all

_____

[1/] All exhibits referred to in this memorandum are attached hereto.

2

of the conduct which is set forth in Counts One through . . . all the way up to Twenty [and while] we don't necessarily agree to the way it is stated . . . to be clear, we are not saying we did not commit the material elements of the offenses charged in those counts" (Tr 23).  The defendant agreed that everything his attorney said was correct (Id.).

C.  The Surplus Recovery Fraud

The facts surrounding the Surplus Money Fraud are as follows.  When a property owner has defaulted on his mortgage payments and the mortgage company forecloses on the property in order to collect the outstanding balance of the mortgage, the property is sold at a public auction.  Any money paid for the property at the auction in excess of the amount owed on the mortgage ("Surplus Money") is money that New York City holds for the former property owner until the former owner claims it.  As described below, the defendant falsely stated to the City that five such former property owners (the "victims") had authorized him to represent them and to petition for the return of their Surplus Money, when, in fact, he did not have the authorization of any of the victims to seek to recover for them the surplus money being held on their behalf  by New York City.

The defendant retained an attorney, Jack Segal, to obtain from the City, on behalf of the five victims,  the Surplus Money the City was holding for the five victims.  The defendant presented to Segal phoney agreements between the defendant's company, SAS Recovery, and each of the five victims in which the victims purported to authorize SAS Recovery to recover from the City the victims' Surplus Money.  In fact, the signature of the victim on each of these agreements was forged and none of the victims had authorized the defendant or his company to recover their Surplus Money for them.  Segal did not know that the agreements were phoney and that none of the victims had authorized SAS to recover the victim's Surplus Money.

Based upon the phoney agreements and false statements that the defendant provided to Segal, Segal petitioned the New York State Supreme Court for New York City to

3

return the Surplus Money that the City was holding on behalf of each of the five victims, to wit: (1) C. Kwok;  (2) S. Mantione;  (3)  L. Rojas-Vega ; (4) M. Scarlino;  and  (5) V. Stewart.  As a result of the false petitions that the defendant caused Segal to file, New York City issued five checks, one for each of the five victims, each of which was payable to "Jack Segal LLP as attorney for [the victim in question]"  (the "City check") that represented that victim's Surplus Money.  The amount of each City check that New York City issued to a victim in care of Segal and the identity of that victim are as follows: (1) Kwok - $360,352 ; (2) Mantione  - $164,039; (3) Rojas-Vega - $37,504; (4) Scarlino - $114,694; and  (5) Stewart - $36,093.  New York City sent each of the five City checks to Segal.

Segal deposited each victim's City check in an attorney escrow account.  Segal then wrote three checks from the escrow account to disburse the funds from each City check, namely: (1) a relatively small check to Segal himself to cover his fees and expenses (the "Segal Fees Check"); (2) a check payable to the defendant's company SAS for the "commissions" that the defendant falsely told Segal that the victim had agreed to pay SAS (the "Segal Commission Check"); and (3) a Segal check for the victim in question ("Segal Victim Check"), which Segal made payable to the victim in question for the remainder of the City check for that victim, i.e., for the Surplus Money New York City held for that victim less the Segal Commission Check and the Segal Fees Check for that victim.  The sum of the five original City checks that New York City sent to Segal, i.e., the sum of the total Surplus Money that New York City held for the five victims before the defendant's alleged "commissions" and Segal's fees and expenses were taken out, was $712, 683.

Segal gave to the defendant the five Segal Commission Checks.  Segal wanted to personally forward the five Segal Victim Checks to the five victims, rather than give those checks to the defendant for the latter to forward to the victims.  The defendant protested, saying that he, the defendant, was the authorized representative for the victims and that Segal  should give the Segal Victim Checks to the defendant for the defendant to forward to each victim.

Segal refused to give any of the Segal Victim Checks to the defendant unless the defendant could produce powers of attorneys to the defendant from each of those victims along with a copy of each victim's means of identification.  The defendant responded by giving Segal forged powers of attorney that purported to be signed by each of the victims, but that were not in fact signed by any of the victims.  The defendant also provided the defendant with counterfeit means of identification for each victim, such as counterfeit driver's licenses, social security cards and credit cards.  Finally, the defendant gave Segal an affidavit signed by the defendant himself in which the defendant falsely swore that the powers of attorney were in force.  Segal thereupon gave the defendant the five Segal Victim Checks, which totaled $559,321.

Virtually all of the funds from the five Segal Commission Checks and from the five Segal Victim Checks ended up in an account in the name of the defendant's company, SAS. Shortly after the defendant deposited the Segal Commission Check related to Kwok and before he had deposited the Segal Victim Check payable to Kwok, the Kwok family discovered from court documents that Kwok's Surplus Money was being paid pursuant to Segal's petition.  The Kwok family filed suit for the return of the Kwok Surplus Money.  Segal advised the defendant of these facts and the defendant returned the Kwok Segal Commission Check and the Kwok Segal Victim Check to Segal for Segal to return to the Kwok family.

To be more specific about the disposition of the five Segal Victim Checks, bank records show that they were disbursed as follows after Segal gave them to the defendant: (1) the Segal Victim Check payable to Kwok in the amount of $293,931 was never cashed because after Segal told the defendant that the Kwok family was filing suit to recover the funds, the defendant returned the Kwok Segal Victim Check; (2) the Segal Victim Check payable to Mantione for $139, 433 was fraudulently altered to change the payee from "Salvatore Mantione" to "Salvatore Mantione/ Haskell trading" and was then negotiated through an account in the name of Haskell Trading; (3) the Segal Victim Check payable to Rojas-Vega in the amount of $28,128 was deposited in an account opened in the name of the defendant's company, namely "SAS Recovery

d/b/a Luz Soto" (Luz Soto being a former joint owner of the Rojas-Vega property), which account was controlled by the defendant, after the signature of the payee was forged on the back as an endorsement; (4) the Segal Victim Check payable to Scarlino in the amount of $70,757 was deposited into an account in the name of "SAS Recovery d/b/a Michael Scarlino" after the signature of the payee was forged on the back of the check as an endorsement; and (5) the Segal Victim Check payable to Stewart in the amount of $27,069 was double endorsed, including a forged endorsement of the payee, and deposited in the account of SAS Recovery, which the defendant controlled. The five Segal Victim Checks totaled $559,321.

All five of the Segal Commission Checks, which Segal issued based upon the phoney agreements between SAS and the victims that the defendant gave him and which totaled $97,164, were deposited in the account of SAS Recovery as well. However, the funds from the Segal Commission Check payable to Kwok in the amount of $49,121 were returned by the defendant after Segal told the defendant that the Kwok family was suing .

Counts One through Five of the indictment charge the defendant with mail fraud in that as a result of the defendant having intentionally and knowingly devised a scheme to defraud the victims, New York City was caused to issue the five City checks and send them to Segal. Indictment ¶¶ 14-16. As a result of the defendant's guilty plea, in which he admitted that he committed all material elements of Counts One through Five, it follows that the defendant is guilty of knowingly and intentionally devising a scheme to defraud each of the five victims and that as a result of the defendant's fraudulent scheme, New York City issued checks totaling $712,683 to the victims which the defendant, rather than the victims, received.[2] Thus, the

---

[2] In his brief, the defendant curiously tries to downplay his role in the Surplus Money Fraud, claiming that an Ami Cohen was the leader in the scheme and that, at least initially, he tricked the defendant into believing that he really did have the victim's authorizations to seek the return of their money from the City. In light of the defendant's admissions at his guilty plea, the defendant's claims that Cohen was the leader of the scheme are irrelevant to the defendant's guideline range. Further, the defendant's claims that Cohen devised the scheme are highly doubtful since all of the documentary records, including the court records, the bank records and the records of SAS, the defendant's own company, connect the defendant to the scheme, but make no mention of Cohen. Indeed, all of the money that was kept ended up with the defendant and not Cohen, save for Segal's

intended loss from the Surplus Money Fraud is, as Probation correctly found, $712,683.  PSR ¶ 6.  While the defendant returned the Kwok Segal Victim Check before cashing it and returned the Kwok Segal Commission funds from SAS after depositing those funds in the account of SAS, he only returned the Kwok funds after the Kwok family, one of the defendant's victims, had learned about the defendant's fraud and had filed suit.  Therefore, the guidelines are clear that the defendant is not entitled to a credit against his intended loss amount for the Kwok Segal Victim Check and the Kwok Segal Commission Check that the defendant returned.  U.S.S.G. § 2B1.1, Application Note  3(E)(i)(no credit against loss for property returned after the victim has discovered the offense or after the defendant knew or should have known that the victim had discovered the offense).

D.  <u>The Insurance Fraud</u>

    1.  <u>The Life Insurance Market, Underwriting and Fair Market Value</u>

In order to understand  the defendant's Insurance Fraud Scheme, it is necessary to understand various facts about the life insurance industry, underwriting and fair market value. Annexed to this report as Exhibit 2, is the report of Dr. Harold Skipper ("Skipper Report" or "Skip Rep"), one of the leading experts in the country on insurance and risk management.  His resume is found at Exhibit 3.  However, to briefly summarize Dr. Skipper's qualifications, he is Professor Emeritus, former Chairman and holder of the C.V. Starr Chair of International Insurance at Georgia State University, which is ranked among the top programs in insurance and risk management in the United States.  He has a Ph.D. from the Wharton School, University of Pennsylvania, in Business and Applied Economics with a concentration in Insurance and Risk Management.  He has written extensively in those fields and co-authored the leading and oldest university level textbook in life insurance.  He has served as consultant to a number of State

---

fees.  At any rate, the defendant has admitted that after he allegedly first discovered that none of the victims had authorized him to collect the victim's Surplus Money, he kept the Surplus Money that was left anyway, making no effort to  find any of the victims or to return the money to the City. Indeed, the defendant admitted that he stole the money owed to Stewart.

Commissioners of Insurance, the United Nations Conference on Trade and Development, the World Bank, the Organization for Economic Cooperation and Development and is a past president of the American Risk and Insurance Association, the world's leading risk and insurance academic association.

  a. <u>Insurable Interest</u>

   Under New York Law, no person (the "owner") may purchase, obtain or cause to be obtained an insurance policy on the life of another (the "insured") unless the owner of the policy on the insured's life has an "insurable interest" in the insured's life.  N.Y. Ins. Law § 3205 (b) (2).  The owner has an insurable interest in the insured's life if the owner is a close relative of the insured who has a substantial interest in the continued life of the insured engendered by love and affection or by having a substantial and lawful economic interest in the continued life and safety of the insured, as opposed to an economic interest that would arise or be enhanced by the death, disablement or injury of the insured.  N.Y. Law § 3205 (a)(1)(A), (B).  Under New York law, an insurance company can rescind a policy after it issued the policy, if it discovers that the owner of the policy has no insurable interest or if the owner obtained the policy based upon a material misrepresentation in applying for the policy.  However, after the period covering two years from the date of issuance of the policy (the "period of contestability") has expired , the insurance company can no longer rescind the policy even if  the company first discovers, after the expiration of the period of contestability, that the owner obtained the policy based upon fraud and has no insurable interest.  N.Y. Ins. Law § 3203 (a) (3).

   As Dr. Skipper explains, the requirement of insurable interest goes back to a law enacted in 1774 by the British Parliament.  Its  purpose is to prevent persons from taking out life insurance as a wager on the life of the insured and to limit life insurance beneficiaries to those who can reasonably be expected to benefit or have an interest in the continued life of the insured, rather than gamblers to whom the insured will be worth more dead than alive.  Skip Rep  ¶¶ 23-27.

As Dr. Skipper states, in describing how wagering life policies create "moral

hazard":

> **Moral hazard** in insurance is the tendency of individuals to alter
> their behavior *because* of insurance.  Thus, consumers who stand
> to collect more in disability income insurance benefits than they
> would earn in wages are more likely to become "disabled."  Moral
> hazard also exists with life insurance.  The lack of any economic
> (or other) interest by a beneficiary in the continued life of an
> insured has, as the U.S. Supreme Court observed, "a tendency to
> create a desire for the event."

Skip Rep ¶32, quoting from  Grisby v. Russell, 222 US 149, 156  (1911) (emphasis in original).

b.  The Secondary Life Insurance Market

If a person who has an insurable interest in the insured  purchases life insurance

on the insured in order to protect himself against the negative economic consequences of the

insured's early death, then that person is not prevented from later transferring the policy to

someone without an insurable interest, as long as he originally purchased the policy without the

intent to wager on the insured's life.  Insurance companies who issue life insurance policies

comprise the primary life insurance market.  The market in which existing life policies are

bought and sold is called the secondary market.  A person who originally purchased insurance on

the insured's life to protect himself against the insured's early death  may no longer need  the

insurance.  Or he may now have an urgent need for cash that he did not have when he purchased

the policy.   In such cases, the original owner of the policy can resell the policy on the secondary

market and obtain more money from the resale than the policy's cash surrender value.  If the

original owner had an insurable interest and purchased the policy on the primary market in good

faith and without an intent to wager on the insured's life, then his resale on the secondary market

is legal even though it results in a person or entity without an insurable interest becoming the

beneficiary under the policy.  Skip Rep ¶¶ 37-42.   These types of sales on the secondary market,

namely, those that are  based on a change in the original purchaser's plans due to changed

circumstances, will be called Settlement Sales.  Settlement companies purchase life policies on the secondary market.

### c.  STOLI Policies

Stranger Owned Life Insurance ("STOLI") policies are policies which, at inception, are purchased with the intent of  reselling them on the secondary market to a person without an insurable interest on the person's life.  One variant of a STOLI policy involves a situation in which a secret investor, who  pays the premiums on the policy and intends to receive the proceeds of the policy, has induced a person who appears to have insurable interest to obtain the policy, acting as a front for the stranger investor who is, in effect, the real owner.  Another variant of a STOLI policy is a policy that is obtained  by a person with insurable interest in the insured, but who intends, from inception, not to hold the policy for protection against the early death of the insured, but to wait until the period of contestability has expired and then resell the policy to a stranger on the secondary market.  A third variant of a STOLI policy combines the first two versions.  In this third variant, a person with an insurable interest and a concealed investor- partner without an insurable interest buy the policy as investors, agreeing to share the payments of the premiums and the receipt of the proceeds.  In this variant, the participation of the stranger partner is concealed from the insurance company and the partners intend from inception to sell the policy on the secondary market for a profit after the two year contestability period has expired.

As Dr. Skipper explains:

> STOLI-related applications to life insurance companies flow mainly from older individuals who have been convinced, usually by a relative who in turn has worked with a STOLI promoter, to apply for large amounts of life insurance whose falsely stated purpose in the application is to cover what they assert will be the high costs of settling their large estates. Life insurance to cover estate taxes has been a popular estate planning tool and routinely issued for decades.  The situation began changing dramatically in the 2004-05 period.  Family members and investor/promoters began convincing elderly parents and grandparents to apply for these large policies, not for true estate conservation purposes, but for the purpose of selling the policies to unknown investors

("strangers").  The intent was to treat the policies as financial commodities and sources of profit. This true purpose is never disclosed to the life insurance companies. The value of the proposed insured's net worth is commonly grossly overstated, as in this case, to convince the companies to issue much more insurance on the person's life than they would otherwise.

Life insurance companies will not knowingly issue STOLI-driven policies for at least two reasons: (1) the nature of the risk in STOLI policies is different from that which the insurance company has priced within the policies and (2) they believe such policies are wagers, not bona fide life insurance, and could run afoul of insurable interest requirements.  Even if such policies were "legal" and were adjudged to have met insurable interest requirements, companies still would decline to issue them because of pricing concerns, among other reasons.   These other reasons include the fact that such applications always involve material misrepresentations.

To get around the obstacle of insurance companies discovering that a policy application is STOLI driven, the involved parties employ several techniques in an attempt to disguise their involvement.[1] These include investors not buying the policy until after the period of contestability (ordinarily, two years) has expired.[2] Other common traits of STOLI transactions include or formerly included the following:

- The typical targeted individual has a high net worth or professes to have one and is 70 or older.

- The application and supporting documentation indicate that the life insurance is for estate preservation or equivalent-sounding purposes.

- The insurance amount is "large" in comparison with typical life insurance policies – in the millions of dollars.

- The beneficiary and policy owner are someone with a facially valid insurable interest, either the insured or an entity commonly identified with estate planning, such as a trust or an LLC.

- If an entity is owner and beneficiary, it commonly will have only recently been created, often contemporaneously with the insurance application.

- Multi-million dollar applications commonly are completed for several insurance companies, more or less at the same time, but with this fact not always fully disclosed to the insurance

---

[1] "STOLI marketers prefer that insurers are kept in the dark about a senior's intention to transfer the policy, as this is a tip-off for a STOLI scheme." *Senior Advisory on STOLI or SPINLIFE Life Insurance Schemes* at http://www.insurance.ca.gov/0100-consumers/0250-seniors-issues/senior-stranger-owned-life-insurance.cfm.
[2] STOLI advocates contend that waiting until the period of contestability has expired provides them with greater assurance that the validity of the contract cannot be successfully contested, so their investment in it is less risky.

companies or, if disclosed, the insurance agent commonly contends that he or she is simply shopping for the best deal for the client and does not intend to buy all policies offered – which is not true.

Arguably, STOLI transactions are wagers on human life and are not valid life insurance as the intent from policy inception is to sell the policy to those who lack a bona fide insurable interest. This trait is not a characteristic of generic life settlements. Further, from the life insurance industry's viewpoint, they impose great costs on the industry, as the insurance companies' assumptions in pricing their policies do not match the reality of STOLI policies, as explained below at paragraphs 76-89. In effect, the fair market value as believed to prevail by the issuing life insurance company becomes quite different from the fair market value as known by the STOLI investor/promoters. Besides possible differences in mortality and lapse experience, additional costs are incurred by the industry (and ultimately its customers) because of the need to engage in more in-depth underwriting in an effort to ferret out such (disguised) applications and because of the expenses incurred in connection with insurance company efforts to rescind such policies. The insurance industry has made diligent efforts to identify and then rescind STOLI-driven policies. Efforts in this respect have progressed markedly from 2005 to the present.

Skip Rep ¶¶ 44-47.

As the government will show in the legal argument, there is certainly authority that STOLI policies are illegal since they violate insurable interest requirements. But whether or not STOLI policies are, in and of themselves, illegal, is not relevant to this case. It is universally acknowledged that it is illegal to lie on an insurance application to conceal from the insurance company that the policy being sought is STOLI. Irrespective of whether STOLI policies are illegal, an insurance is not required to issue STOLI or any other kinds of policies. No insurance company will knowingly issue STOLI policies for a number of reasons, including that: (1) STOLI policies are inconsistent with the public policy behind the insurable interest requirement, namely the policy which disfavors wager policies; and (2) insurance companies do not have sufficient data to be able to price the policies properly (see section 1.d. below). Wager policies create a situation in which the insured is worth more to the beneficiary dead than alive. Insurance companies have an economic as well as a public policy incentive to avoid wager policies because, as the Supreme Court has

12

recognized, the monetary windfall that a wager policy bestows upon the beneficiary in the event of the insured's early death has "a tendency to create a desire for the event."  Grisby v. Russell, 222 US 149, 156  (1911).  The clearest evidence that insurance companies will not knowingly issue STOLI  policies is the lengths to which STOLI investors, such as the defendant, will go to tell outrageous lies on insurance applications in order to conceal from the insurance companies that the policy being sought is a STOLI policy.

D.  Underwriting

"**Underwriting** is the process by which an insurance company decides whether to issue requested insurance and, if it decides to issue it, on what terms and conditions and at what price."[1] Skip Rep ¶9 (emphasis added).  Underwriters request and consider three types of information about the insured in deciding whether to issue a policy, for what amount and at what premium prices.  The three types of information are medical information, lifestyle information and financial information.  The two most common legitimate purposes for life insurance are estate planning and protection of the insured's family from the loss of income resulting from the insured's early death.   (As noted, wagering on the insured's life is not a legitimate purpose.)  All insurance companies will request, consider and rely upon financial information in making underwriting decisions about either of these two types of policies.  Skip Rep ¶¶ 10, 15-19.

Insurance companies will not issue more insurance than is necessary for the purpose for which the insurance is sought.  Providing more insurance than is needed for the stated  purpose of the policy would create a situation in which the insured is worth more to the beneficiary dead than alive.  Over-insuring an insured would  convert a life policy with a legitimate  purpose, e.g., estate planning,  into an illegitimate life wager policy, the latter being something that all insurance companies will try diligently to avoid.  Financial information is essential in determining how much insurance is necessary for the stated purpose of the insurance and whether the requested amount of insurance is a request for over-insurance.  For example, the needed amount of life insurance for

---

[1] Black and Skipper, p. 633.

estate planning is that amount of life insurance which, at the time of the insured's future death, will be sufficient to pay the taxes on the insured's estate.  (The life insurance policy ownership is set in such a way that the death proceeds are excluded from the insured's estate.)  One cannot decide how much insurance is necessary to pay estate taxes without considering the insured's present and probable future net worth at the time of his future death.  These net worth estimates and projections cannot be made without accurate present net worth and annual income data for the insured.  Skip Rep ¶¶ 15-19.

Similarly, to determine how much life insurance is needed to replace, at the time of the insured's death, the income the beneficiary could be expected to receive from the insured while the insured is alive, the underwriter must have a full financial picture of the insured, including  net worth and annual income.  Skip Rep ¶ 18 ("Insurers  view this type of financial information as crucial in deciding whether to issue insurance and how much to issue").

Dr. Skipper sets forth in his report a detailed chart of published  underwriting guidelines issued  by different insurers which set forth each insurer's standards for deciding the maximum amount of insurance each insurer will agree to issue based upon the insured's net worth.  Dr. Skipper's chart and his associated discussion leave no doubt that, contrary to the statements made in the defendant's sentencing brief and  by the defendant's expert, "the  universally accepted practice in the life insurance industry [is to] rely[] on the present net worth of proposed insureds in deciding whether to issue insurance and, if so, the amount".  Skip Rep ¶¶ 20-23.

Moreover, in order to properly price a life insurance policy, the  underwriter needs to have accurate data about any relevant population to which the insured belongs.  For example, to set premium prices in a way  that  protects  the insurance company from the risk of the insured's early death from a certain disease that the insured has, the underwriter needs to have accurate population data showing, let us say, that the relevant population of persons with that disease have a five times greater or a perhaps a fifteen times greater than normal risk of dying within five years.  That data will be used to price the premiums on the policy as necessary to protect the insurance

company from losing money as a result of the increased risk.  However, underwriters have no statistics on various populations of STOLI insureds and thus cannot make sufficiently informed decisions about how to appropriately  price such  policies.  When  underwriters  do not have adequate data to allow them to properly price a particular policy they will deny coverage.

E.  Fair Market Value of Life Policies

Even with accurate population data, at the time a life insurance policy is issued, no one can predict with certainty whether or when the insurance company will pay the death benefits nor for how long the owner of the policy will make premium payments or even the size of the flexible premiums that the owner will pay each time premiums are due.  While no one can  predict these  payments  with  certainty, due to the uncertainty about future events, knowledgeable purchasers and sellers can make informed  predictions about the events which will determine the insurance company's future payments and receipts.  The policy's fair market value is based upon what buyers and sellers who have made such predictions would value the policy at after negotiating.

An asset's fair market value is what an informed buyer and seller will agree upon as the price of the asset.  The informed negotiators will make predictions about economic events in the future and the market will determine how much the asset is worth.

The fair market value of an insurance policy are the terms  upon which knowledgeable and informed insurers and purchasers of insurance  products  would  agree  upon. The fair market value will change from time to time but it will provide an economic valuation of the policy at any point in time.

2.  The Fraudulent Scheme

The defendant obtained $32.5 million of insurance on the life of his wife's grandmother, Helena Eckstein, and he tried to obtain even more insurance than that on  Eckstein's life.  The insurance  was in multiple policies  from  four different insurance companies: New York Life  (3 policies with a total face value of $12.5 million);  Travelers/Metlife (2  policies with a total face value of $10,000,000);  Jefferson Pilot/Lincoln Financial (3 policies with a total face value of

$5 million); and John Hancock (1 policy with a total face value of $5 million). The defendant was fully aware when he applied for these life insurance policies that Eckstein was virtually penniless.

Eckstein's net worth was at most a few thousand dollars. She lives in Section 8 rental housing and, based upon her income, receives federal funds to assist in paying her rent. Her income was minimal. In 2005, she received a check every three months of approximately $1,500 as a result of a pension and she received a social security check every month of approximately $690. She withdrew this minimal income when she received it and used it for her household expenses. After withdrawing her minimal income when it came in, her bank balance was less than a thousand dollars. Eckstein had no assets except for the very inexpensive furniture in her apartment and she had no will because she has essentially no assets.

At the time that the defendant applied for these policies on Eckstein, he had investor partners who were complete strangers to Eckstein and who, along with the defendant, intended to pay the premiums on the policies and share in the proceeds of the policies. The defendant never intended Eckstein to pay any of the premiums on the policies. Indeed, he was well aware that she could not afford to do so. The defendant also intended from the outset to sell these policies at a large profit on the secondary market after these policies had passed the two year period during which the insurance companies could seek to rescind the policies based upon fraud or lack of an insurable interest. Needless to say, the defendant was fully aware that the persons to whom he intended to resell the policies after two years were persons without an insurable interest in Eckstein's life. He was also fully aware that the investors with whom he paid the premiums and intended to share in the proceeds of the policies had no insurable interest in Eckstein's life. The defendant was also fully aware that no person, himself included, needed life insurance on Eckstein's life to protect himself or herself from the economic consequences of Eckstein's early death. Any person who was the beneficiary of a life insurance policy on Eckstein, himself included, was a person to whom Eckstein was worth more dead than alive.

16

As we will explain in detail in the argument, the defendant likely believed that if he purchased the multi-million dollar policies on Eckstein's life, that he would be able to resell the policies on the secondary market at a 300% profit. His experience in reselling the policies bears that out. Out of every $1 million in sales price he received for reselling a policy, $750,000 of those $1 million consisted of pure profit. Of the six Eckstein life insurance policies, worth $20 million, that the government is aware that the defendant actually resold, the defendant received gross sales prices totaling $5,900,000 on policies on which he had paid only $1,419,208 in premiums, for a net profit of $4,480,792. That represents a 315% return of profits on the premiums he paid. To estimate what the defendant likely expected as his profit on all nine policies when he purchased these policies in 2005, we project over all nine policies the defendant's actual returns on the six policies he later resold. Using that projection, we can estimate that, in 2005, when the secondary market was at its height, the defendant's likely expected gain when he planned to resell all nine policies worth $32.5 million in the secondary market two years later was between and $8 million.

However, the defendant's true hope was that Eckstein would pass away before the two year period lapsed since, under those circumstances, the defendant would receive the full $32.5 million face values of the policies. As the defendant explained to the government during a proffer session, if that were to happen that would be, as he put it, the "grand slam" return on his investment.[11]/

_____

[11]/The defendant was interviewed at two proffer sessions under a proffer agreement which provided that the government would not introduce the defendant's statements at the proffer as evidence at sentencing (although it would notify the Court at sentencing of such statements to the extent that it believed that it was required to do so, along with a notification to the Court of the government's agreement). However, the agreement further provided that the government was free to introduce the defendant's statements as evidence to rebut, directly or indirectly, any evidence offered or factual assertions made by, or on behalf of, the defendant at sentencing. The defendant's statement in the text concerning the "grand slam" is offered in direct response to the assertions in the defendant's brief and the report of the defendant's expert, Mr. Gober, claiming that the defendant did not intend to cause, and did not actually cause, any losses to the insurance companies. All of the defendant's statements from proffer sessions that are set forth in this memorandum of law are in response to assertions in the defendant's memorandum of law or Mr. Gober's report. In any event, as a result of the defendant's assertions in his Objections to the PSR, which are incorporated into his memorandum of law (Br at 1), the defendant cannot object to the government relying upon any statements he made at either of his two proffer sessions. In his Objections to the PSR at 1, the defendant asks the Court to take into account at sentencing

17

Nonetheless, as shown in section 3, the applications the defendant submitted to the insurance companies contain numerous lies, in many cases lies that appeared directly over the defendant's signature, and that were calculated to conceal that these policies were being purchased on behalf of investors who had no insurable interest in Eckstein's life, with the intent to resell the policies after two years to other persons who had no insurable interest in Eckstein's life. The applications also sought face amounts that were far in excess of any legitimate insurance needs of any of Eckstein's family members, including the defendant. The policies applied for were intended to render Eckstein worth more dead than alive to Vaysman, his partner investors and the persons to whom Vaysman would try to resell the policies after two years. The lies told on the applications over the defendant's signatures and the oral lies that the defendant told after the policies were resold were all intended to conceal that fact from the insurance companies.

### 3.  The Defendant's Fraudulent Applications to Jefferson Pilot, John Hancock, Travelers and New York Life

On March 29, 2005, the defendant submitted to Travelers/Metltife an application for a $10 million life insurance policy on Eckstein which he signed and in which he falsely stated that Eckstein's net worth was $34.5 million and that her annual income was $230,000. Exhibit 4. In that document, on the same page as the defendant's signature, it is falsely stated that the purpose of the $10 million policy that was sought was "estate liquidity and conservation." Id.

On April 7, 2005, the defendant submitted to Jefferson Pilot/Metlife, three single page amendments to his applications for three policies totaling $5 million in life insurance. On each of those single page amendments  - -  one for each of the three policies for which he was applying  - -  it is falsely stated directly over the defendant's signature, that Eckstein's total assets

---

that he allegedly candidly explained at the proffer sessions all of the events and transactions that related to the Surplus Money Fraud and the Insurance Fraud schemes, and he argues to the Court that his statements at the proffers provide a basis for a downward departure of his sentence under U.S.S.G. section 5K2.0 and for a more lenient sentence under 18 U.S.C. section 3553(a). Having asked the Court to consider his proffer statements at sentencing, he cannot object if the government cites to any of those statements. (Parenthetically, the government disputes that the defendant was fully truthful at his proffer sessions.)

18

were $34 million, that Eckstein's total net worth was $34 million and that Eckstein's annual unearned income was $235,000. Exhibit 5. An agent's report for that policy stated that the purpose of the insurance the defendant sought on Eckstein's life was estate planning. Exhibit 6.

On April 21, 2005, the defendant submitted an application to John Hancock to receive a $5 million life insurance policy on Eckstein's life. The application, which was signed by the defendant, contained numerous lies, namely that Eckstein's net worth was $35 million - - which is $1 million higher than it had been two weeks earlier when the defendant applied to Jefferson Pilot. Exhibit 7. The application signed by the defendant also stated that the purpose of the $5 million policy on Eckstein's life was "estate preservation." Id. Needless to say, this was an outright lie, because Eckstein had no estate to preserve and her family did not need life insurance at all, let alone $5 million in life insurance, to cover estate taxes in the event of her death. Another document submitted as part of the application falsely stated that no person other than the owner would "obtain any right, title or interest in any policy issued on the life of the Proposed Life Insured as a result of this application." Exhibit 8 at p. 6. This statement is also completely false, since, as the defendant concedes, he had investor partners who would share in the premium payments and the proceeds of the policy. Objections to PSR at 8.

On August 29, 2005, the defendant submitted to New York Life an application for $12.5 million of life insurance on Eckstein. In a one page supplement to that application submitted by the defendant, it is stated <u>directly above the defendant's signature</u> that Eckstein's net worth was $62 million, consisting of $55 million in real estate and $7 million in cash and securities, that Eckstein's annual income was "$2.5 million plus" and that the purpose of the insurance that was sought on Eckstein's life was "estate preservation." Exhibit 9. Note that according to the grossly fraudulent financial data on Eckstein that the defendant submitted to New York Life in August, 2005, Eckstein's net worth was allegedly $28 million higher than it had been four months earlier and Eckstein's annual income was over ten times higher than it had been four months earlier.

All of the above false statements that appeared over the defendant's signature in the foregoing applications also appeared over Eckstein's signature. Indeed, Eckstein's signature, as that of the insured, routinely appeared on the line above the defendant's signature. Eckstein's English is poor, and she cannot read English at all. She did not understand anything about the insurance policies. The defendant would ask her to sign a document and she would. The defendant was responsible not only for signing his own name below these false statements on the applications, but also for causing Eckstein's signature to appear underneath these numerous false statements.

When the policies were issued by the insurance companies, the insurance companies delivered to the defendant the policies and the attachments to the policies, which included many of the foregoing false statements.

4.   The Defendant's Fraudulent Application to Sun Life

In December 2005, after he had already obtained the foregoing policies on Eckstein's life, the defendant submitted an additional application to insure Eckstein's life to Sun Life. In that Sun Life application, Eckstein's net worth is stated to be $62 million. The defendant signed that application. Sun Life denied the application. Thus, the total amount of insurance for which the defendant applied on the life of his wife's penniless grandmother was $37.5 million. Exhibit 10.

5.   The Defendant's Post-Application Lies to New York Life

In early 2006, New York Life identified approximately 200 suspect policies that might be STOLI policies. STOLI policies were becoming an increasing concern in the industry and New York Life undertook a review to identify STOLI policies so that it could attempt to rescind them. New York Life investigated the 200 suspect policies, including the $12.5 million in Eckstein policies, to determine if any of those policies were in fact STOLI and if the applicant on any of those policies had lied on the application in order to conceal that the policy being requested was STOLI. On February 23, 2006, New York Life conducted an interview of Eckstein, the insured on the three Eckstein policies, and Vaysman, the trustee on those policies.

At the interview, which took place at the defendant's home, two New York Life investigators asked questions of Eckstein and the defendant.  However, the defendant answered all of the questions for himself and for Eckstein.  He answered  questions about what Eckstein supposedly knew, as well as questions about what he knew.  He did not communicate with Eckstein before answering questions about Eckstein's knowledge.  During the interview, Eckstein did not speak or provide any information whatsoever.

During the interview, the defendant stated that the Helena Eckstein Life Insurance Trust, of which he was the trustee, paid  the premiums.  He further stated that the family paid the funds into the trust for it to pay the premiums.  This was false because he did not mention that stranger investors  paid  premiums.  During the interview, when asked for Eckstein's  net  worth, the defendant stated that her net worth was $60 million.  This was a complete lie and  the defendant knew it to be a complete lie.  Moreover, it was the same complete lie that appeared  directly over his and Eckstein's signatures on the New York Life application supplement dated August 29, 2005 that New York Life had relied upon in deciding whether to issue the requested policies in the first place.

But the defendant did not leave his lie about Eckstein's net worth at that.  He elaborated upon that lie significantly.  He stated that Eckstein's net worth was derived from residential real estate, which is also  the lie that appears directly over the defendant's signature on the New York Life August 29, 2005 application supplement.  When the investigators asked the defendant what properties Eckstein owned so that they could verify that she actually owned them, the defendant then  backtracked  and  stated  that  the properties were not in her name, but were rather in the family's name, but that Eckstein had loaned  the family money so that  the family could buy the properties.  Needless to say, all of these statements, directly from the defendant's  mouth, were outright lies.  Nowhere during the interview did the defendant admit that the policies were STOLI, that he had investor partners who paid premiums and would share in the proceeds of the policies, that the purpose of the policies from the outset was for him to collect benefits either by

Eckstein's early death in two years or by reselling the policies on the secondary market after two years or that since Eckstein was penniless and had no estate, the purpose of the policies was not, as was falsely stated directly over his signature on the application supplement, "estate preservation".

On June 7, 2006, New York Life sent out written questionnaires to the defendant and Eckstein. The defendant stated on his questionnaire, <u>directly over his signature</u>, that the person who paid the large premiums to New York Life on the Eckstein policies was Eckstein herself. Exhibit 11. This statement, which conceals the fact that the Eckstein New York Life policies were STOLI, is completely false and contradicts his statement at the interview that the family funded the large premiums. The defendant did not disclose that he never intended Eckstein to pay any premiums and that Eckstein could not afford to pay, and never, in fact, paid, nor even funded, any of the premiums sent to New York Life to keep the Eckstein life policies in force.

5. <u>The Defendant's Plea</u>

The outrageous lies that the defendant told in person to New York Life investigators in early 2006 and the lies he told in his June 2006 questionnaire, which reiterate the prior lies contained in the written applications that the defendant signed, thoroughly refute the defendant's claims that he was a passive figure in the fraudulent insurance scheme. But there is no need to conduct a hearing to assess the evidence on this issue since the defendant's plea allocution resolves all facts that need to be resolved in order to sentence the defendant. At his plea, the defendant pleaded guilty to Count Six and admitted to being guilty of Counts fourteen, fifteen and sixteen. Thus, at his plea, the defendant admitted that by each of the following dates he had knowingly and intentionally devised , and taken steps to effectuate, the scheme to defraud each of the following insurance companies by means of the insurance fraud scheme described in the indictment: (1) New York Life by October 25, 2005; (2) John Hancock by September 19, 2005; (3) Jefferson Pilot by November 15, 2005; and (4) Travelers by November 18, 2005. The latest date by which the defendant, according to his plea allocution, began defrauding each insurance company by means of the insurance fraud scheme alleged in the indictment was within two to seven months

of the issuance of the insurance policy in question.   In short, the defendant had commenced his fraudulent scheme against each insurance company long before the expiration of the New York two year period within which the insurance company could sue to rescind that insurance policy.

   6.  The Spira Policies

        In December 2005 and January  2006,  two life insurance policies, each for $5 million, were issued by American General Life Insurance ("AIG") on the life of Diana Spira.  The owner of each policy was listed as Simon Spira.  On each application, the annual income and net worth of the insured were listed, respectively,  as $600,000 and $13 million.  Unbeknownst to AIG, Spira's net worth and annual income were grossly inflated.  Similarly, unbeknownst to AIG, the Spira policies were STOLI.  If AIG had known that Spira's financial circumstances were grossly inflated or that the policies were STOLI it would not have issued  the policies.

        Between June 2006 and April 2007, the defendant made $300,000 in premium payments on these STOLI  policies.  He made the premium  payments against a line of credit held in the name of his wife, Malka Vaysman.  The property he used to secure the line of credit was not his or his wife's, but rather the home of his parents, Khaim and Margarita Vaysman.  The bank required proof of ownership of the collateral to open the line of credit.  The defendant's wife signed a document  stating  that she was also known as Margarita Vaysman, who is one of the owners of the collateral pledged.  In fact she is not known as Margarita Vaysman.

        During the two year period of contestability on the Spira policies, Spira, the insured, died.  The estate filed a claim for the $10 million dollars in death benefits.  During its investigation, AIG discovered the facts the "owner" of the policy, Simon Spira, had concealed and lied about, namely that the insured's net worth and annual income were grossly overstated and that the policy was actually a STOLI policy.

        The  defendant  does not contest that he made the premium payments mentioned above, that the Spira policy applications contained numerous misrepresentations concerning the insured's   financial circumstances or that  the policies were STOLI.  Indeed, he virtually

concedes that the Spira policies, like his policies on Eckstein's life, were STOLI.  The defendant states  that "one of the investors in one of the nine policies [on Eckstein's life] that were  overseen by the defendant wanted a portion of  the investment monies that he had given the defendant to be returned to him.  At the investor's direction [the defendant] sent those  monies directly to [AIG], rather than  paid over to the investor individually."  Br at 12-13.

AIG  has  subpoenaed the defendant to a deposition in the suit it brought to rescind the Spira policies.  The defendant has not appeared in response to the subpoena.

The defendant paid all of the premiums that he paid on the Spira policies after his February 23, 2006 interview with New York Life investigators about the Eckstein policies.  What the defendant stated  at that New York Life interview shows that the defendant believed  that STOLI policies were illegal.  Yet, according  to his claims in  his sentencing  papers,  after that New York Life interview, he proceeded to make STOLI payments on the Spira policies at the request of a person whom he knew to be a STOLI investor.  Yet he also claims in his sentencing  papers that he is innocent of any criminal activity on the Spira  policies.   So let us examine the defendant's knowledge and  actions at  the time of his New York Life interview and thus, at the time when he later  paid  premiums on the Spira policies.

The defendant, as he admitted to the government at a proffer, was aware that STOLI policies were  a subject of concern to insurance companies.  The defendant also knew, as he told the government at a proffer[llll],  that at the time of the New York life interview and questionnaire, that if he did not answer New York Life's questions, then New York Life would rescind the policy.  So what did the defendant do concerning New York Life's questions?  He lied , telling New York Life that Eckstein's net worth and annual income were, respectively,  $62 million and $230,000, and  by stating that Eckstein herself paid the premiums on the policies.  In short, the defendant, at a time when he knew that New York life might, based upon his answers,  rescind the policies and  knew

---

[llll]/These  proffer statements by the defendant rebut the defendant's assertions at sentencing that he intended  no loss to the insurance  companies, that  STOLI policies are perfectly legal and that he did nothing illegal when he paid  premiums on the Spira policies.

that New York Life was concerned about STOLI, falsely answered New York Life's questions and concealed that the Eckstein policies were STOLI.   The defendant, by falsely stating that Eckstein paid the premiums and that she was rich, was required to tell New York Life that he and STOLI investors, rather than Eckstein, were paying the premiums.  United States v. Autuori, 212 F. 3d 195, 119 (2000) (when a person gives false, partial and ambiguous answers, he commits fraud if he does not disclose the full truth).  Since the defendant did not disclose the truth to New York Life in February 2006 about the STOLI character of the Eckstein policies,  he showed  that at that time, he believed that STOLI policies were illegal.  Yet, after that time, having already demonstrated that he believed STOLI to be illegal, he paid  the  premiums on the Spira policies, as a stranger to those policies,  on   behalf  of  another stranger to those policies whom he knew to be a STOLI investor.  The defendant is thus criminally responsible for the premiums he paid on the Spira policies

The government concedes that with respect to the Spira policies, unlike the Eckstein policies (as to which the defendant's guilty plea admissions resolve any issues of fact that the defendant  belatedly raises in his sentencing papers), a  Fatico  hearing would  be necessary to resolve his criminal responsibility for sentencing  purposes.  The government is willing to present evidence at a Fatico hearing concerning the defendant's criminal responsibility in connection with the Spira policies.  However, such a hearing may not be necessary.  The government's principle contention concerning the defendant's sentence is that the defendant's guideline level should be based upon an intended loss to the insurance companies of $32.5 million, less two years worth of premiums, plus  an  intended loss of $712.000 to the victims of the defendant's Surplus Money Fraud.  If the defendant's intended loss is deemed to include the $10 million Spira policies then his intended loss will thereby increase from over $30 million to over $40 million, which will have no effect on the defendant's guideline level whatsoever.  U.S.S.G. §2(b)(1)(H) (loss of $20 million to $50 million results in a 22 level enhancement).

What  is significant about the Spira policies is that they constitute STOLI  policies that would  not have been issued if the insurance company had known the truth about the lies that

25

the applicant  told and that as a result of the lies, the insurance company is being asked to pay the full face values of the policies.  That was the defendant's primary intent, as the government will demonstrate in a later section.

   7.  The Defendant's Contentions

          The defendant  makes  a number of contentions which are clearly false, contrary to his admissions at his guilty plea or legally misguided.  We review those contentions below.

          The defendant claims that although he is legally responsible for certain lies to the insurance companies, only some of which he acknowledges, he claims that the insurance companies did not care about these lies, that they were not material and that he did not intend that the insurance companies would  suffer any loss.  He focuses on the lies concerning the defendant's net worth, although those were not the only lies the defendant told.

          First, the defendant claims that five  of  the nine applications for life insurance that he signed do not even ask for net worth or financial information.   He states that the three New York Life applications "make no inquiry into net worth" (Br at 10), and that "it does not appear that any net worth information  was supplied with respect to  Lincoln  Life  [which is Jefferson Pilot] policies LF5513692 or 5513690" (Br at 10, n.7).  These statements are completely incorrect.  As seen from Exhibit 9, in a one page New York Life supplemental application, appearing directly over the defendant's signature, are the false assertions that Eckstein's net worth was $62 million, that her annual income was $2.5 million and that the purpose of the insurance was estate preservation.  As shown in Exhibit 5, for each of the three Jefferson Pilot policies the defendant signed a single  page amendment, and, directly over the defendant's signature on the amendment is the false statement that  Eckstein's  net worth  is $34 million.  As the government's highly credentialed expert Dr. Harold Skipper states in his expert report, "the universally accepted practice in the life insurance industry  [is to] rely[] on the present net worth of proposed insureds in deciding whether to issue insurance and, if so,  the amount."  Skip Rep  ¶ 20.

Next, the defendant asserts that insurance companies that ask about net worth and other financial information do not care about that information and do not need financial information to decide whether or not to issue a life insurance policy. As support for this, the defendant claims that the insurance companies did no investigation to confirm or refute the false financial information in the applications. As Dr. Skipper states, "No reasonable life or property insurance company will knowingly issue an insurance policy for an amount which results in total coverage being greatly disproportionate to the financial impact that would result *to the payee* from the 'total destruction' of the object of the insurance, whether that 'object' is a life or a building. If the payee – ordinarily the insured under property insurance policies and the beneficiary under life insurance policies – would suffer no financial loss from such a 'total destruction,' the insurance company will refuse to issue any insurance." Skip Rep ¶ 17.

Indeed, it is contrary to generally accepted underwriting standards to insure persons for millions of dollars even if they are penniless. Insurance companies do not knowingly issue insurance on the life of an insured if, as a result, the insured would be worth more to the beneficiary dead than alive. As the discussion and chart provided by Dr. Skipper in his report shows, all insurance companies have generally accepted underwriting guidelines which specify what financial status of the insured will justify the amount of life coverage being sought. Skip Rep ¶¶ 20-23, chart (p.6). Those guidelines are published, and Dr. Skipper cites to them. Id.

The defendant's contention that the insurance companies did no checking of the financial information in the application before approving the applications is also false and misleading. These applications were submitted in 2005 when STOLI policies first started to appear, but were still somewhat under the radar. Skip Rep ¶ 59. Even so, three of the four insurance companies, namely, New York Life, Jefferson Pilot and John Hancock, received Inspection Reports from outside independent examiners whose job it was to verify the information in the applications. Exhibits 12, 13, and 14. The Inspection Reports obtained confirmation of the information in the applications through interviews, which is the standard procedure. Indeed, New

27

York Life tried to do a credit check on Eckstein, but found no data, which is not uncommon in the Hasidic community.  It refused to proceed with the application until it had received confirmation from a Ben Zion Klein, who claimed to be a neighbor and friend of Eckstein's and a business owner in the community.  Ben Zion falsely stated that Eckstein "was in the commercial real estate business and is still active in major decisions."  Exhibit 12.

That some of the Inspection Reports were ordered by the agent does not prove that the insurance companies did not care about the results of the Inspection Reports.  Most agents are honest and hardworking and take their obligations to function legally and truthfully seriously.  They have a motive to do so.  If an insurance company learns that as agent is knowingly bringing a STOLI application or any wagering application to it, then the insurance company will bar the agent from submitting future business to it and, depending upon what the agent did, refer information about the agent to criminal authorities.   Skip Rep ¶ 56.

Moreover, since STOLI policies first appeared in 2005, insurance companies have expended ever increasing resources to detect and reject STOLI applications and rescind STOLI policies within the contestability period. Skip Rep ¶ ¶ 47, 59.  As noted above, in 2006, New York Life commenced a large investigation to identify and to rescind STOLI policies that had previously been issued, but that were still within the contestability period.   It identified approximately 200 policies to investigate further, including the three Eckstein policies.  It succeeded in repudiating over 100 of these policies for being STOLI, returned millions of dollars in premiums paid on the policies and commenced litigation on 22 of the policies.  It was prepared to rescind the Eckstein policies based upon the results of its investigation, but it encountered legal difficulty.  The portion of the New York Life applications for insurance in which the defendant told his lies about Eckstein's financial condition and about her desire for insurance for estate planning purposes was the Supplemental Application form.  New York Life relied upon those lies in the Supplemental Application in deciding to approve the defendant's application for insurance.  But the Supplemental Application was not attached to the completed policy and New York Life

concluded  that  a contract rescission action  based upon a document not attached to the  policy would have been difficult to win under New York law. (New York  Life  has since made  sure that supplemental  application  forms would  be attached  to the policy.)

The other insurance  companies that insured  Eckstein's life have  also taken ever increasing steps beginning no later than 2006 to ferret  out STOLI applications  and policies and to deny or rescind them.   For example, during last year alone, Met Life denied over $120 million dollars in applications on STOLI grounds, including inflated  net worth figures, and it rescinded STOLI policies worth  $24 million.   Jefferson Pilot/Lincoln Financial, in the last three years has denied or rescinded over $208 million in STOLI policies and applications. John Hancock, at a cost of over $4 million,  has repudiated over 50 policies worth millions of dollars and involving the following combination of factors: (1) inflated financial information; and (2) intent to sell at the inception.   None of these companies has ever knowingly accepted an application for a wagering policy and would  not have issued  the Eckstein policies it had been known that they were wagering policies.  Almost none of the STOLI policies that the four companies have repudiated since 2006, as discussed in the past two paragraphs, were policies on which death claims had yet been filed.

In any event, the  defendant is  precluded  from arguing that the insurance companies did not care about the lies he told them concerning Eckstein's  financial condition and his alleged intent to apply for insurance on Eckstein's life for estate planning purposes.   At the defendant's plea, he admitted that he was guilty of, and had committed all material elements of Counts Six through Twenty, each of which charged him with devising a scheme to defraud the insurance companies  by making material misrepresentations to them and further charged that without  these  misrepresentations  about Eckstein's financial circumstances, the insurance companies would not have issued the policies.  If, as the defendant argues in his sentencing papers, the insurance companies did not care about the defendant's lies, then the lies would not have  been material and the defendant would not be guilty of  the crimes of  which  he  has already  admitted

that he is guilty.  His guilty plea trumps the inconsistent statements and arguments that  he  makes in his sentencing memorandum  and  expert  report.

The defendant also argues in  his  brief and in the report of his expert Thomas Gober, that the defendant intended no loss to the insurance companies.  This contention will be responded to in depth in the argument section of this memorandum.

As Dr. Skipper shows, the defendant, in his brief, and Mr. Gober, in his report, continually confuse and conflate the ordinary Settlement Policies purchased on the secondary market, which, usually are legal, and STOLI policies, which are, especially when accompanied  by fraudulent misrepresentations, illegal.  Skip Rep ¶¶ 47 -49, 52  (defendant discusses articles in the New  York  Times and the Economist that are about Settlement Policies, as if they were about STOLI policies, when  they  are  not) .  Dr. Skipper explains in detail the differences between the two types of policies.  Id.  Most importantly, "life insurance companies will not knowingly issue STOLI-driven policies for at least two reasons: (1) the nature of the risk in STOLI policies is different from  that  which  the  insurance company has priced within the policies and (2) they believe such policies are wagers, not bona fide life insurance  . . . [and also for] other reasons, including] the  fact that [STOLI] applications  always involve material  misrepresentations."  Skip Rep ¶ 45.

There are a number of additional seriously mistaken, inaccurate and misleading statements in the defendant's brief and in the report of Mr. Gober, which Dr. Skipper refutes in detail.  We refer the Court  to  Dr. Skipper's  thorough  analyses  on  these points.  Skip Rep ¶¶ 48-64.  To the extent  the  Court  needs to resolve the disputes  between  the experts, it can do so without  an evidentiary hearing and based upon the expert reports and resumes of the two experts that have been submitted to the Court.     It is well-settled that the defendant has no right to an evidentiary hearing to resolve factual disputes at sentencing.  United States v. Slevin, 106 F. 3d 1086, 1091 (2d Cir. 1996).  All that is required is that the court "afford the defendant some opportunity to rebut the Government's allegations."  Id.  The Court could allow the defendant to

submit evidence or make arguments orally or in memoranda.  <u>United States v. Lee</u>, 818 F. 2d 1052,

1056 (2d Cir. 1987).  The government submits that the Court can resolve the disputes between Mr.

Gober and Dr. Skipper without an evidentiary hearing.  The differences between the resumes of

the two experts and between the depth and completeness of, and the citations to professional

sources contained in, their respective reports speak for themselves.  Of course, if the Court

directs, the government will make Dr. Skipper available to testify.

POINT I

 STOLI  POLICIES ARE ILLEGAL 

The defendant argues at length in his brief that STOLI policies are legal.  He

then uses his conclusion that they are legal to then argue that he did not intend that his fraud

would cause loss to the insurance companies and that he did not in fact cause any loss to the

insurance companies.  A good portion of his discussion is based upon his confusion between

ordinary Settlement Policies that are purchased on the secondary market, which, without more,

are legal, and STOLI policies.  The government responds to the defendant's argument that

STOLI policies are legal below so as to properly focus the issues that are relevant to sentencing.

The main point however, is that, as explained below, whether or not STOLI policies are legal

absent misrepresentations on the applications is irrelevant to the sentencing of this defendant.

The Eckstein policies for which the defendant applied were STOLI in two

different ways.  First, from the beginning, the defendant secretly had as partners stranger

investors who, along with the defendant, paid the premiums on the Eckstein policies and were

going to share in the profits from the policies.  (Indeed, at a proffer session, the defendant told

the government that he had a stranger partner who shared the premiums and profits with him,

with the defendant being a 66% partner and the stranger being a 33% partner.)  In addition, from

inception, the defendant intended to pay premiums (along with his partner) until the period of

contestability expired and to then sell the policies at a profit on the secondary market.[5]/

---

[5]/This statement from the defendant's proffer, which describes a single, one-third partner, is
inconsistent with the defendant's statement in his Objections at 8, which he incorporates into his

31

There is most assuredly sound authority that a STOLI policy, even without fraud, is illegal because it is in violation of New York's insurable interest requirement.  In Angel v. Life Product Clearing LLC, 530 F. Supp. 2d 646, 652 - 655 (S.D.N.Y.  2008) (Chin, J.), the Court was presented with the question of whether a policy, issued to a person with an insurable interest, who had the intent at inception to immediately transfer the policy to a stranger, was a policy that violated New York's insurable interest requirement.  The Court analyzed the wording of the New York insurable interest requirement in the context of other provisions of the statute, N.Y. Ins. Law § 3205, that contains that requirement.  It also reviewed the long history of the law's disfavor for wagering life insurance  policies, a long line of New York State cases and an opinion of the General Counsel of the New York State Insurance Department.  The Court concluded that while a person with insurable interest can take  out a policy with the intent to protect his family against the economic consequences to him of the insured's early death and could  then decide, after he received  the  policy, to transfer the policy to another, without violating the law.  However, if the owner intended at inception to benefit a stranger to the insured  then he was engaging in a sham procurement of insurance which is, in reality, a wagering  policy that violates the insurable interest requirement.  Id.  The latter is exactly what the defendant did here when he took out the Eckstein policies with stranger investor- partners, or a single, one-third investor- partner.

In Kramer v.Lockwood Pension Services, 653 F. Supp 2d  354, 387 - 388 (S.D.N.Y.  2009) (Batts, J.), the Court, after analyzing the statute and the precedents, concluded that  purchasing a policy with the intent to benefit a person without insurable interest is in violation of the insurable interest requirement.  In a December 19, 2005 opinion of the General Counsel of the New York State Insurance Department, which is entitled to deference in judicial interpretations of New York Law, Kurcsics v. Merchants Mut. Ins. Co., 49 N.Y. 2d 451 (1980), the general Counsel concluded that, "based  on our review of the transaction, it appears that the

---

brief, that  because of the many investors  who  owned  the policies with him, only "a small portion of the monies received from  the sale of [the Eckstein] policies went to the defendant."

32

arrangement is intended to facilitate the policies solely for resale .  It is our view that a plan of this nature does not conform to the requirements of the New York Insurance Law . . . [because] the potential transferees do not appear to have a legitimate insurable interest in the lives of the Clients."

In Lincoln Life v. Bernstein, 2009 N.Y. Misc. LEXIS 1732 (S. Ct. Onondaga County 2009), the Court, in a slip opinion, concluded, without legal analysis and without any citation of authority,  that STOLI  policies are legal.  In Kramer, the issue concerning insurable interest that was decided was certified for resolution to the New York State Court of Appeals.

However, the important point for this case is that whether STOLI policies are, in and of themselves, legal, whether Kramer and Angel were correctly decided and whether the policies at issue in this case fit under the ruling in Kramer or Angel are all question which have absolutely no relevance to the instant case.  The crucial point is that insurance companies are not required to issue an insurance policy simply because it is legal to do so.  They have the right not to issue any policy.  Legal or not, insurance companies will not knowingly issue a STOLI policy or any policy that results in the insured being worth more to the  beneficiary dead than alive. Skip Rep ¶¶ 23, 45.   That includes not only all STOLI  policies, but also policies issued solely for the benefit of a beneficiary with an insurable interest, if the policy provides to the beneficiary significantly more money upon the insured's death than the beneficiary would  receive  if  the insured continued to live.

It is universally accepted by all authorities that it is illegal to lie to the insurance company when applying for a policy about anything that is material.  Kramer, 653 F. Sup. 2d at 378; Bernstein, 2009 N.Y.  Misc. LEXIS 1732 (holding that suit could be maintained to determine whether the owner of the policy lied in the application about whether he had had discussions with anyone about assigning or selling the policy).  The defendant was prosecuted for fraud and his guilty plea establishes that his lies, about Eckstein's financial condition and that the purpose of the policies was estate planning , mattered  to  the  insurance  companies.

POINT II

THE DEFENDANT  INTENDED LOSS TO THE INSURANCE COMPANIES OF
OVER $30 MILLION AND HE SHOULD THUS BE SENTENCED AS A LEVEL 26
OFFENDER; IN THE ALTERNATIVE, THE DEFENDANT CAUSED AN ACTUAL LOSS
TO THE FAIR MARKET VALUE OF THE INSURANCE COMPANIES' INTERESTS IN THE
POLICIES THROUGH HIS  FRAUD OF OVER $7 MILLION AND HE THUS SHOULD BE
SENTENCED AS A LEVEL 24 OFFENDER; HE INTENDED A GAIN TO HIMSELF OF
OVER $7 MILLION AND ACTUALLY ACHIEVED A GAIN OF OVER $3.6  MILLION

      The government now addresses the defendant's guideline range.  As already

shown in the STATEMENT OF FACTS, section C, the intended loss to the victims of the

defendant's Surplus Money Fraud was $712,683.  Thus to compute the defendant's guideline

range in this case, the court must add the $712,683 intended loss for the Surplus Money Fraud to

the appropriate loss for the Insurance Fraud .   In this section, the government addresses the

appropriate loss figure for the defendant's Insurance Fraud scheme.

      We first address the applicable law and then show that the defendant's argument

that he neither intended to cause nor caused any loss to the insurance companies istotally without

merit.  The government's primary argument is that the intended loss amount in the Insurance

Fraud Scheme is approximately $30 million.  In the alternative, the government contends that the

actual loss caused in this case to the insurance companies was $4,4880,792, which is also equal to

the defendant's intended gain.   Finally, the defendant's actual gain on the insurance fraud scheme

was $3,360,000.

A.  The Guidelines

      The defendant's recommended guideline sentence is governed  by U.S.S.G. §

2B1.1, the Fraud Guidelines, which are largely driven by the loss that resulted to the victim from

the defendant's fraud.  As seen by the Application Notes to the Fraud Guidelines, "loss" as used in

the guidelines, means the greater of the actual loss caused to the victim and the loss the defendant

intended to cause to the victim. App. Note 3 (A).

      The intended loss is the "pecuniary harm that was intended to result from the

offense and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur . . . e.g., as in a government sting operation or an insurance fraud in which the claim exceeded the insured value." Ap. Note 3 (A) (ii).  The Court is only required to make a reasonable estimate of the loss.  App. Note 3(B).  The Court shall take into account factors such as "the fair market value of the property unlawfully taken, copied or destroyed  . . ."  App. Note  3(C).  "[I]f there is a loss, but it reasonably cannot be determined," then "[t]he Court shall use the gain that resulted from the offense as an alternative  . . ."  App. Note 3(B).  We note again that under the guidelines, the term "loss" means the greater of the actual and the intended loss.

B.  Calculations Concerning Death Benefits, Defendant's Actual Sales and Expected  Sales

Before specifically arguing how the loss on the Insurance Fraud should be analyzed, there are certain calculations from actual events in this case that can be computed that will prove very useful in the ultimate analysis of the loss on the Insurance Fraud scheme.  The defendant sold six of the nine  policies, with a total face value of $20 million, at a very substantial profit.   These sales occurred after the two year contestability period had lapsed.  The defendant allowed one policy with a face value of $5 million to lapse and he stated to the government that he gave two New York Life policies with total face values of $7.5 million  to a non-profit organization.  Thus, the defendant is no longer paying any premiums and the premiums he paid in the past on the nine Eckstein policies totaled $2,544,208.   If Eckstein had died before the two year contestability period expired then he would have received $32.5 million at that time.  His total profit, that is, his actual gain and the insurance companies' actual loss under those circumstances, would have been $32.5 million less two years of premiums, or approximately $30 million.

On the six policies that the defendant actually sold, he paid  $1,419,208 in premiums and realized 5.9 million when he resold these policies on the secondary market for a profit of $4,480,792.  That means that approximately 3/4 of the sales prices he received were  pure profit.  Put another way, his return on his investment was, on the average,  300%  or, for every $1 in premiums he invested, he received back $4 when he resold.   For the six policies he sold, he was

35

also able to sell the polices for, on the average,  29.5%  of the polices' face values (death benefits).

The premiums the defendant paid on the three policies that he did not sell totaled $1,125,000.   Thus, the defendant's total premiums paid were $2,544,208 and the total sales price he received was, again, $5,900,000, resulting in a total actual gain to the defendant of $3,360,000.[⁗]  Actually, the defendant received a higher gain than that.  If he gave two policies to a charitable organization then he would have been entitled to a tax deduction on his federal, state and city taxes of the fair market value of those policies.  That would have entitled him to reduce his taxes by between 40% and 50% of the fair market values of the policies.  But we will use the $3,360,000 figure as the defendant's actual gain.

However, the defendant's intended gain was much higher than the defendant's actual gain.  As the defendant told the government, by the time he began reselling the Eckstein policies on the secondary market, which was in 2007,  the secondary market had begun to soften.[⁗]  That is not surprising because in 2005, the STOLI phenomenon had only recently begun to surface and insurance companies had not yet fully appreciated and reacted to that phenomenon.  In 2005, when the defendant fraudulently obtained the STOLI policies, all policies were selling and the defendant would have fully expected to sell all of the policies at a profit.  Indeed, prices on the secondary market for STOLI policies were lower in 2007, when the defendant resold his policies, than they had been in 2005, when the defendant originally purchased the policies.  Skip Rep ¶¶ 94-96 and p. 25, n.34 to n. 37.  Thus, a very conservative estimate of the return the defendant intended in 2005, when the secondary market for STOLI policies was at its height, can be arrived at by projecting the average rate of return the defendant obtained on the six

---

[⁗]/The actual  loss  figure arrived at by the Probation Department of less  than  1 million, PSR par. 10, is incorrect for two different reasons.  Most significantly, the government has received additional information in the past two weeks that was not available when the PSR was written.  Further, Probation mistakenly misread the spreadsheet the government gave it at the time and thus, double counted some of the premium payments listed on that spreadsheet.  The figures in the text are accurate.  Skip Rep pars. 97-101 and chart (p. 27).

[⁗]/This proffer statement is inconsistent with the defendant's assertions that  he  caused no actual loss to the insurance companies, as shown in section E below.

policies he sold in 2007 over all of the nine policies he purchased in 2005.  According to the 2009 opinion in Bernstein, 2009 N.Y.  Misc. LEXIS 1732 at *2, the Supreme Court of Onondaga County stated  that even in 2009, when an insured  resold a  STOLI policy through an investor on the secondary market, he could expect to receive 10% to 30% of the face value as his portion of the purchase price, with larger portions going to the investor and a commission to salesperson. The defendant resold six of his policies at 29.5%  of their face value in 2007 and it makes sense that the defendant expected in 2005, when the market was at its height, to receive a sales price at least that high on all of the nine policies.

Thus, projecting the return on investment that the defendant received on six of the policies over all of the nine policies is a reasonable estimate of the defendant's expected gain in 2005 when he fraudulently purchased the policies.   This projection results in an a total expected profit of between $7,043,292 (low estimate) and $8,032,000 (high estimate).   Skip Rep ¶¶ 97-101. We will explain in later sections how these calculations can be used to arrive at a loss figure for the defendant's Insurance Fraud  scheme.

We next show that the defendant intended to cause a loss to the insurance companies.

C.  The Defendant Intended a Loss to the Insurance Companies

The defendant contends in his papers that he intended no loss to the insurance companies, but his contention is belied by the evidence and by his guilty plea.  The defendant told the government at proffer sessions that: (1)  he learned about the practice of buying insurance on elderly individuals with the intention of reselling the policies after two years at a profit and that he then  became involved in that practice, first by purchasing a policy on a person to whom he was not related and then,  by purchasing such policies on his grandfather and Eckstein; (2) a friend of the defendant's was a one-third  partner with the defendant on the Eckstein policies and they paid the premiums and agreed to receive the profits under a sharing arrangement of one-third for the friend and two-thirds for the defendant; (3) the defendant himself  raised with the government  the

concept of STOLI, which he called "IOLI" (i.e., investor owned life insurance), and the defendant admitted that STOLI was a subject of concern to insurance companies; (4) The defendant explained that if Eckstein died before the two year period had expired then that would be the "grand slam" because he would then be able to collect the full face value of the policy; and (5) the defendant stated that he had already sold $20 million of the $32.5 million in Eckstein policies, collecting a total resale price of $6 million dollars and that three quarters of the $6 million was profit.[⸾⸾⸾⸾⸾⸾]/ As shown in the foregoing section, the government has now confirmed the defendant's statement s about his resale prices (approximately $6 million), profits (approximately 75% of that or $4,5000,000 on the six policies he sold) and return on investment (approximately 300%).

From the above admissions alone, it is clear that the defendant, at the least, intended some loss to the insurance companies. He knew that he was engaged in buying STOLI policies. The defendant did not tell the insurance companies that he was engaged in STOLI policies. (In fact he affirmatively lied about the fact that he was purchasing STOLI policies, telling the insurance companies that the purpose of the policies was estate planning.) Yet the defendant fully understood that the insurance companies were concerned about issuing STOLI policies. Did the defendant believe that the insurance companies were concerned about issuing STOLI policies because they thought that they would make more or even the same amount of money on STOLI policies than they were making on non-STOLI policies? If the insurance companies did not want to issue STOLI policies, as the defendant admits, and as the lies he needed to tell to the companies to get them to issue the policies confirm, and if he purchased STOLI policies from them without their knowledge anyway, then how can he argue that he did not intend to cause harm to the insurance companies? Indeed, as shown in section B, the defendant intended to make a profit of millions of dollars as a result of his fraud. As Dr. Skipper so eloquently puts it, if the defendant "had no intention to and did not impose any losses on the duped

---

[⸾⸾⸾⸾⸾⸾⸾⸾]/ Each of these proffer statements, as shown in the text, are inconsistent with the defendant's repeated statements in his sentencing papers that he neither intended nor caused any loss to the insurance companies.

insurance companies . . . [then] [w]e have . . . to ask ourselves, 'from where did he believe the millions in [expected ] profit [would] ultimately c[o]me." Skip Rep 30. As shown in the section E, they came from the insurance companies.

Finally, the defendant's argument that he intended no loss to the insurance companies is precluded by his guilty plea, during which he admitted that he had committed fifteen counts of fraud. One cannot commit fraud unless he intends to deprive the victim of money or property, since that is what the term "fraud" means. McNally v. United States, 483 U.S. 350, 358 (1987).

D.  The Defendant Intended a Loss to the Insurance Companies of Approximately $30 Million

As noted in section C above, the defendant stated to the government that if Eckstein died within the two year  period of contestability then he would collect the "grand  slam," that is, the full face value of the policies. In other words,  the defendant, in the first instance, wanted to collect the full face values of the policies. That is a clear indication that the defendant intended to cause the insurance companies to lose approximately $30 million.

The defendant argues in his brief  that if Eckstein died within the two year contestability period then the loss resulting from her death was not the result of his fraud  because, according to the defendant, the insurance companies accepted the risk of her early death when they decided to issue the policies as part of their business judgment in the first place.  Br 14-15. That argument is seriously flawed. As the government has shown, the insurance companies would not have issued the Eckstein policies if they had known, as they did not, that the Eckstein policies were wager policies. The defendant must  personally agree with the government on that issue since he admits that he knew that the insurance companies were concerned about issuing STOLI policies.

Thus, if the defendant's fraud  caused the insurance companies to issue insurance policies that they would not otherwise have issued if they had known the truth  - - and the defendant's fraud did cause that, as shown above - -  and if the insured were to die before the

contestability period were to expire, then the losses of the full face values of the policies would, under those circumstances, be losses that <u>did</u> result from the fraud.  Indeed, the insurance companies would not have issued the policies if they had known the truth because they are concerned about the fact that wager policies increase the risk of death.  As the Supreme Court has recognized, the monetary windfall that a wager policy bestows upon the beneficiary in the event of the insured's early death has  "a tendency to create a desire for the event."  <u>Grisby</u>, 222 US at  156 .  As Dr. Skipper explains, the increased risk may be subtle and subconscious, such as the thought, "I hope she doesn't die soon, but if she does, here's hoping it's within the next two years."  Skip Rep ¶ 71.   That is what the defendant thought, as his statement about the "grand slam" he would win if Eckstein died proves.

The standard for computing the intended loss in a case in which the defendant fraudulently obtained instruments with face value amounts which might, but also might not, all result in losses to the victim,  is discussed in <u>United States v. Confredo</u>, 528 F. 3d 143, 152 (2d Cir. 2008).  In that case, the defendant applied for a number of loans with varying face value amounts.  The court addressed the defendant's argument that he did not intend to obtain all of the loans and thus his intended loss should be less than the sum of the face values of the loans for which he applied.  The Circuit held as follows:

> [The} opinion in <u>Geevers</u> devised a sensible approach for district courts to use in determining the defendant's "intended loss" in cases where the government seeks to equate possible loss with intended loss.  <u>The district court may presume that the defendant intended the victims to lose the entire face value of the instrument, but the defendant may rebut the presumption by producing "evidence to demonstrate that he actually intended" to cause a lesser loss.</u>

528 F. 3d at 152 (emphasis added).

Thus, in this case there is a presumption that the defendant intended to cause a loss to the insurance companies of the total face values of the policies, namely $32.5 million (less two years worth of premiums), which is approximately $30 million.  How could  the

defendant ever  rebut  that presumption here, since he admits that if Eckstein died during the two year contestability period then he would make the "grand slam."  The grand slam was clearly his primary intent.  He certainly had secondary intents if his primary intent were not achieved, but in light of his own statements and the presumption in favor of using the entire face values as the intended loss, the intended loss in this case for the Insurance Fraud scheme is approximately $30 million.

E.  The Actual Loss to the Insurance Companies

        If the defendant's primary intent of collecting the grand slam were not realized, then the defendant had a back up plan.  The defendant had set up a win-win situation for himself, where he wanted the grand slam, but if that were not to come about, then he intended to make a profit of 300%  by reselling the policies on the secondary market.  Since the defendant's primary intent was to realize the grand slam, the much higher profit for him,  the government contends that the Court should use the grand slam, approximately $30 million, as the intended loss.  Confredo ; Skip Rep ¶ 71 ("[t]here is no question that, from a financial standpoint, the early death of the insured is the clear preference").   However, if the Court, for any reason, does not accept the government's primary argument that the defendant's first intent is to collect the face values of the policies, then the government moves to the issue of the insurance companies' loss if the defendant resold the policies on the secondary market.

        The key fact in estimating the loss under the secondary scenario is that the deal that the defendant duped the insurance companies into believing that they were entering into with the defendant - - namely, the sale of an insurance policy to a wealthy individual for estate planning  purposes  - - was a very different deal from the one that the defendant knew that he was actually entering into with the duped insurance companies - - namely, the purchase of insurance on the life of a poverty stricken woman with no estate by the defendant and stranger investors who intended from the outset to sell the policies at huge profits in two years on the secondary market.  While the insurance companies would not have entered into the bargain if

they had known the truth, if they were forced to knowingly enter into the defendant's deal, as they were by the defendant's fraud, then they would  have had to have used very different assumptions in pricing the policies and the premiums they would have charged and the income to them would have been very different.   Dr. Skipper explains why this is so, as we summarize below.  The insurance companies lost money as a result of the fact that they were duped into accepting the defendant's deal.

As Dr. Skipper explains

> **The Mortality Component.**  That mortality is a component of life insurance pricing is self evident. It is the job of actuaries to estimate the future likelihood of paying death claims under policies and devise an equitable means of assessing each policy for its proportionate share of these claims. Insurance companies develop products to be relevant  and  appeal to different target markets. These markets can vary enormously one from  the  other  and so too  can their mortality experience.  For example, we know that  individuals with  low incomes and  net worth  do not live as long on average as those of moderate incomes or net worth, and that individuals of still higher incomes and net worth  live  longer  still.[1]  Stated bluntly, mortality experience  under  policies  targeted and priced for the affluent market, such as in estate planning cases, would reasonably be  expected  to be better than mortality experience of policies targeted to low income customers. Actuaries  know  this fact and would price these two types of policies differently based on expected mortality differences.
>
> Thus, life insurance companies will incur losses from having to pay more in death claims than they priced into their policies  because  more insureds die earlier in situations where policies were procured through misrepresentations about the insured's wealth, as in this case. However, the situation  is  more than just experiencing higher mortality rates because of differences in financial status. It can be thought of in this way. If some insurance company decided that it wanted to sell STOLI-driven policies, what mortality rates  should  it  assume  in deriving its prices, knowing that (1) the parties purchasing the policies are doing so as wagers on human life, (2) because of no or doubtful insurable interest, ultimate  and  possibly  short-term beneficiaries prefer  and  profit more if insureds die sooner rather than

---

[1] The gap in life expectancy within the general population appears, in fact, to be widening. See, e.g., Robert Pear, "Gap in Life Expectancy Widens in the Nation," *The New York Times*, March 23, 2008.

later, and (3) the insurance amounts issued are grossly in excess of the insurable values of the insureds?  How do they price for this  moral hazard that can range from the extreme of  murder to the more  benign "death by neglect"?[2] They cannot.  This is the reason  why  we cannot  conduct a credible calculation using STOLI mortality data. To my knowledge, such data do not exist. Nonetheless, this is the first of the four potential sources of losses to life insurance companies that unknowingly sell high-value STOLI policies to poor insureds.

Skip Rep ¶¶ 78-79.

The point of Dr. Skipper's above discussion is not simply that in STOLI policies there  is a higher risk of the insurance company having to pay death claims.  It is that given the higher risk of death in the general STOLI  population, an insurance company would have to charge significantly higher premiums if it were to knowingly sell STOLI  policies so as to protect itself from financial losses as a result of this increased risk.  Since there is no credible data accurately measuring the  risks in STOLI policies, because STOLI policies are issued through fraud with the intent being to conceal their existence from insurance companies, there is  no way of knowing  by how much the premiums on the Eckstein policies would  have to  have been increased to make the premiums appropriate for the increased  risks.  However, it is clear that, in light of basic actuarial principles, as a result of the   defendant's  fraud, the premiums on the Eckstein policies were

---

[2] Interestingly,  the  day  that  I finalized this report, *The Wall Street Journal* (Leslie Scism and Mark Maremont, "Life, Death and Insurance: Indiana's $15 Million Mystery," April 12, 2010), ran a front-page story of a $15.0 million STOLI policy purchased in 2006 whose owner in 2008 apparently was running out of funds to pay premiums. The *Journal's* description of STOLI, its issues, and how insurance companies are duped will be familiar to any reader of this report. In this story, the elderly insured was found dead and fully clothed in her bathtub.  Circumstances surrounding her death were reported as suspicious, including that the  much younger policy owner/beneficiary spent the evening with her at a bar where  she  became intoxicated; that he was the last person to see her alive, escorting  her home from the bar and into her house; that he had debt problems; and that the purpose for the insurance ("estate planning") and the insured's net worth are alleged  to have been misrepresented in the application. The owner denied having anything to do with the insured's death.  However, one could imagine a scenario in which an owner of a large STOLI policy, unable to find a buyer for his policy in 2008 and unable to continue the very high premium payments, wanted to protect his multi-million dollar "investment."  What might the owner do? [As a perhaps interesting aside, the secondary life market was quite soft in 2008, as defendant in this case has observed (discussion with Charles Kleinberg of April 12).  In fact, he was unable to sell three of the policies insuring the life of his wife's grandmother during this period.]

43

significantly underpriced as a result of the defendant's fraud in hiding the STOLI nature of the policies from the insurance companies.

A second way that the insurance companies lost money derives from the fact that all of the Eckstein policies were flexible premium policies which gave the owner a range of premium payments, from a high end to a low end, that the owner could pay each month. Many owners pay, and actuaries expect a certain number of owners in the relevant population to pay, the high end of the flexible premium range in order to cause build up of higher cash values in their policies. Actuaries base their flexible premium ranges on these expectations. Owners of STOLI policies pay the low end of the flexible premium ranges because they are not concerned about cash surrender value but want to hold on to the policy for as little cost as possible until they resell the policies on the open market. So this is another way in which premiums were underpriced.

A third way in which the premiums were underpriced derives from the fact that a certain percentage of policies are expected to lapse based upon actuarial data. Thus, insurance companies, in order to remain competitive with other insurance companies, can and do charge lower premiums rates because of these expected lapse assumptions. However, STOLI policies are destined for the secondary market where the secondary purchaser will never allow the policy to lapse since that would defeat the entire purpose of holding onto all policies he purchases for investment. A fourth way in which the Eckstein policies were underpriced is that STOLI policies can and do cause huge expenses not caused by non-STOLI policies. STOLI policies, as a group, cause insurance companies to incur huge expenses on investigations to ferret them out and in taking steps to deny or rescind them. As shown above, in this case, New York Life went to great lengths to discover and rescind its Eckstein policies and all of the insurance companies in this case have taken extensive steps to investigate and repudiate STOLI policies. The need to budget money for these activities would cause actuaries, based upon data from the relevant population, to increase premium prices. That was not done in 2005 when these policies were priced.

44

In sum, there are a number of ways in which the insurance companies received less than appropriate premiums on the Eckstein policies because the insurance companies were tricked into entering into deals that were different from the ones into which they thought that they were entering. If they had received that extra money, the extra money would result in higher profits or lower losses when these policies are ultimately closed out. However, there is no way of computing from the bottom up what the appropriate premiums for an actuary to charge would be. This is so because there is no actuarial data on the population of STOLI insureds and, if STOLI policy owners continue to conceal the fact that they are purchasing STOLI policies from insurance companies, there never will be.

However, there is a way of estimating the actual losses to the insurance companies from the top down, namely by looking at fair market values and the prices secondary market purchasers were willing to pay for policies, like the Eckstein policies, in 2005. As Dr. Skipper states:

> In considering these [pricing] factors, purchasers on the secondary market are placing an economic value on the combination of the losses that they impose on and the gains that they confiscate from unwitting insurance companies. They are, in effect, monetizing via STOLI ruses and lies, then confiscating these amounts from the companies. As to this case, the amount that a purchaser on the secondary market was willing to pay for one of the policies at the time it was issued to the defendant is a reasonable proxy for the difference in fair market value between the policy that the company thought it was selling to the defendant and the very different market value of the policy that the defendant knew that he was buying from the company. In other words, on the day that the defendant purchased the policy from the insurance company, the prices being offered in the secondary life market can be considered as the market placing a value on the differences between the deal that the company thought that it was entering and the deal into which it actually entered; i.e., on the company's losses.

Skip Rep ¶ 93.

The prevailing prices in the secondary market in 2005 are not available. But a reasonable proxy for those prices is what a STOLI investor in 2005 could reasonably have expected to have realized as a profit on resale when he purchased the policy in 2005. Skip Rep ¶ 94. We can estimate the defendant's expected profit in 2005. As already shown, the defendant's

expected profit when he purchased the policies in 2005 was between $7 million and $8 million, and that is a reasonable estimate of the actual loss to the insurance companies . Skip Report ¶¶ 93, 101 and chart on p. 27. Hence, the actual loss to the insurance companies is less than the intended loss of approximately $30 million. Accordingly, under the guidelines, the defendant's guideline level should be calculated based upon his intended loss of $30 million, which results in a guideline level of 26, after deducting 3 levels for acceptance of responsibility, which, in turn, yields a guideline sentencing range of 63 to 78 months. In the alternative, if the Court rejects, for any reason, the government's position that the intended loss was $30 million, then the Court should sentence the defendant based upon the actual loss of $7 million to $8 million, which results in a guideline level of 24, after deducting 3 levels for acceptance of responsibility, which, in turn, yields a guideline sentencing range of 512 to 63 months.

The computation of the actual loss figure of $7 million to $ 8 million is conceptually sound and relies on the differences in fair market values between the policies the insurance companies thought that they were selling and the very different policies that the defendant knew that he was buying - - and fair market value is an accepted method under the guidelines for computing the loss. App. Note 3 (C) (i). In the event the Court does not accept the government's primary position of an intended loss of $30 million, then there are two other ways of arriving at the $7 million to $8 million alternative figure by applying the guidelines themselves. First, the $7 million to $8 million loss figure is not only an estimate of the actual loss to the insurance companies, using a fair market value approach, it is also, as we have seen, an estimate of the defendant's secondary intended gain if Eckistein did not die in two years. If the Court rejects the government's primary position that the defendant, in the first instance, intended to receive the death benefits in two years, then it is clear that, in the second instance, if Eckstein did not die within two years, the defendant intended to cause a loss to the insurance companies that was equal to his intended gain through secondary market resales of $7 million to $8 million. As noted above, where did the defendant think that the $7 million to $8 million

46

windfall profits that he intended to achieve through secondary market resales of STOLI policies were going to come from if not from the insurance companies that he defrauded into believing that they were selling ordinary estate planning policies on the life of a rich insured?

The second alternate way of arriving at the $7 million to $8 million figure under the guidelines is that where there is a "loss," but it cannot be reasonably calculated, then the Court "shall" use the defendant's "gain." U.S.S.G. § 2B1.1, App. Note 3 (B). Since loss is defined as the greater of actual and intended loss, App. Note 3 (A), then the only reasonable way of interpreting this Application Note is that if there is a loss or an intended loss, but they cannot be reasonably estimated, then the Court shall use the greater of the defendant's gain or intended gain. See, e.g., United States v. Manas, 272 F. 3d 159, 165 (2001) ("Appellants do not contest that . . . their intended gain is an appropriate proxy for estiamting loss"). As shown in section D above, the defendant unequivocally intended a loss to the insurance companies, and his intended gain was $7 million to $8 million.

The defendant's actual gain, which occurred in 2007, was $3,360,000. But, as Dr. Skipper opines, that figure is an inferior estimate of the insurance companies' losses from the fraud compared to the estimate obtained by using the defendant's intended gain in 2005. The difference between the fair market values of the deals the parties believed that they were entering into, which is what the defendant's intended gain in 2005 is an estimate of, is the loss caused by the defendant's 2005 fraud. By contrast, confining the focus to the policies sold or not sold in 2007, when secondary market prices were lower, underestimates the loss caused by the defendant's fraud, because the difference in the parties belief in the fair market values took place in 2005 and not 2007. Skip Rep ¶¶ 104 - 105. Nonetheless, if the Court were to compute the defendant's guideline level using the defendant's actual gain, then that would result in a guideline level of 22, after deducting 3 levels for acceptance of responsibility, which would yield a guideline sentencing range of 41 to 51 months.

47

F.  The Government's Guideline and Sentencing Positions Summarized

The government   summarizes   its guideline positions and provides its final sentencing  positions in this section.  While the  defendant's argument  that he neither intended nor  caused any loss to the insurance companies is totally  without merit, the defendant's intended loss on the Surplus Money Fraud was $712,683.   Thus, at a minimum, using  $712,683  as  the loss figure. the defendant's guideline level is 18, after deducting 3 levels for acceptance of responsibility,  yielding a guideline sentencing range of 27 to 33 months.   Moreover, if the Court finds no loss on the Eckstein  policies, then the government asks for a <u>Fatico</u>  hearing on the defendant's liability for the Spira  policies, on which there is unequivocally an intended loss, namely the death benefits  that have already been claimed.

There  is no need for a <u>Fatico</u> hearing on the issue of the loss on the Eckstein policies.  The defendant's responsibility for the Eckstein policy fraud is established  by his plea admissions and the loss amount for the Eckstein policies can be established based upon the defendant's admissions to the government and the expert reports.  If the Court chooses to hear expert testimony, then the government requests that it be permitted to provide that testimony telephonically, because Dr. Skipper lives in Atlanta.  There  is no need  for a <u>Fatico</u> hearing on the Surplus Money Fraud scheme , since the extent of the defendant's responsibility for that fraud and the  appropriate loss  amount caused by that fraud can be  established based upon his plea admissions.

If  the  Court finds that there was any loss on the Eckstein policies then, given the loss amount enhancement categories in U.S.S.G.  § 2B1.1(b)(1), the loss amount of $712,763 will not affect the loss options for the Eckstein policies of  $3,3360,000, $7 million to $8 million and $30 million.

Moreover, the government asks that the defendant not be sentenced to a below guideline sentence, given the very serious frauds in which he engaged.  Indeed, on the Insurance Fraud  scheme, the  defendant not only defrauded  the insurance companies, but he also deceived

48

his wife's grandmother, who cannot read English, and whom he will concede knew nothing of the fraud. Further, the Surplus Money Fraud was extremely serious, since, in committing it, the defendant defrauded New York City, the New York State Supreme Court (to which he submitted false petitions), his own lawyer, Jack Segal, and five low income former property owners whose homes were taken through foreclosure and from whom the defendant attempted to steal and, in many cases ultimately did steal, the moneys they were owed as a result of the foreclosures. Yet, if the Court finds any loss from the Insurance Fraud scheme, as the government argues that it should, then the very serious Surplus Money Fraud scheme will not have any effect on the defendant's guideline range. That is a strong reason for not sentencing the defendant to a below guideline sentence.

Finally, Count Six is the only count of conviction. That count charges the defendant with committing insurance fraud against New York Life. The government thus asks that the defendant be ordered to pay New York Life, which issued $12.5 million of insurance on Eckstein, a per stirpes share of the $7 million to $8 million actual loss that the defendant caused to all of the insurance companies. While the Probation Department found no actual loss to the insurance companies, the government respectfully submits, based upon the thorough expert report of Dr. Skipper, to which Probation did not have access, that Probation was wrong in that regard.

<u>CONCLUSION</u>

For the reasons stated above, the defendant should be sentenced as a level 26 offender, or in the alternative as a level 24 offender and he should be ordered to pay restitution to New York Life.

Dated: Brooklyn, New York
 April  14 , 2010

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York

49

271Cadman Plaza East
Brooklyn, New York  11201

CHARLES S. KLEINBERG
Assistant U.S. Attorney