**Report**

**of**

**Harold D. Skipper, Ph.D., CLU**

Professor Emeritus of Risk Management and Insurance

Georgia State University

Atlanta, GA

**Regarding**

*United States of America v. Edward Vaysman, Defendant,*

**United States District Court, Eastern District of New York**

**File No. 01-CR-416 (S-8) (ILG)**

**Table of Contents**

Table of Contents ................................................................................................................ 1
I.      Introduction and Opinions ...................................................................................... 2
II.     My Qualifications ..................................................................................................... 2
III.    Life Insurance Underwriting ................................................................................... 3
    A.      Nature and Purpose ........................................................................................... 3
    B.      Financial Underwriting ...................................................................................... 4
    C.      The Importance of Insurable Interest ............................................................. 7
        1.      Background ................................................................................................. 7
        2.      The Public Policy Rationale for Insurable Interest Requirements ............ 8
        3.      The Economic Rationale for Insurable Interest Requirements ................. 8
IV.     The Secondary Life Insurance Market ................................................................... 9
    A.      The Process and Economics of Life Settlements ......................................... 10
    B.      "Stranger-Owner Life Insurance" (STOLI) ................................................. 10
V.      Inaccurate, Misleading, and/or Unsupported Assertions by Defendant ............... 12
VI.     Approaches to Estimating Losses to the Insurance Companies ............................ 18
    A.      The Potential Policy Death Benefit as the Driver of Loss .......................... 19
    B.      The Differences between the Values of the Deals: An Actuarial Approach ............... 20
        1.      How STOLI Transactions of this Type can Impact Policy Pricing .......... 21
        2.      Putting it all Together ............................................................................. 24
    C.      The Differences between the Values of the Deals: An Economic Approach ............... 24
        1.      Establishing the Secondary Market Expected Price .............................. 24
        2.      Measuring the Defendant's Expected Gain ........................................... 26
        3.      Measuring the Defendant's Actual Gain ............................................... 28
VII.    Conclusion ............................................................................................................ 29
Exhibit A:  Material Relied Upon in Preparation of this Report ................................... 31

## I.   Introduction and Opinions

1.    I have been retained by the United States Department of Justice to offer opinions about losses associated with the defendant's insurance-related actions in this case. I am informed that he pled guilty to fraud in this connection. In forming my opinions, I have relied upon materials shown in Exhibit A, discussions with Charles Kleinberg, and my professional experience.

2.    In summary, based on my understanding of the facts and circumstances of this case, my opinion is that meaningful losses are associated with the transactions through which defendant procured several policies insuring the life of his wife's grandmother. These transactions fall into the category of life insurance purchases called "stranger-owned life insurance" (STOLI), which involve the purchase of life insurance policies through misrepresentation for the purpose of later selling the policies for a profit to anonymous investors ("strangers"). The losses to the insurance companies can be properly considered in three ways; specifically from (1) the policies' death benefits; (2) the effects on these policies' pricing components of their being, unknown to the insurance companies, STOLI-driven purchases; and (3) the reasonably expected or actual profit that the defendant anticipated from the sale of the policies as being the market's placing an economic value on the insurance companies' losses.

3.    My opinion further is that assertions made in the *Sentencing Memorandum* and in the *Gober Report*[1] in an effort to paint these losses as nonexistent are inaccurate, misleading, and/or unsupported. Specifically, defendant would have the Court believe that STOLI is indistinguishable from other life settlements (the sale of an existing policy to investors) and life insurance companies knowingly issue STOLI policies as evidenced by, among other factors, their not considering the net worth of proposed insureds in their decision whether to issue insurance and the amount to issue. Defendant's efforts are an attempt to convince the Court that the companies suffered no losses. As I establish herein and contrary to defendant's erroneous assertions: (1) STOLI is clearly different from generic life settlements, (2) life insurance companies will not knowingly issue a STOLI policy, and (3) except for small policies, life insurance companies always consider the proposed insured's financial situation in deciding whether to issue insurance and, if so, in what amount.

## II.   My Qualifications

4.    I retired from Georgia State University in 2005, holding the rank of Professor of Risk Management and Insurance and holder of the C.V. Starr Chair of International Insurance. I am now Professor Emeritus of Risk Management and Insurance. I was Chairman of its Department of Risk Management and Insurance from 2001-2004. The *U.S. News & World Report* "Annual Survey of America's Best Colleges" has consistently ranked this risk management and insurance academic program as among the best in the United States.

5.    I obtained a Ph.D. in 1977 from the Wharton School, University of Pennsylvania, with a major in Business and Applied Economics and a concentration in Risk and Insurance. During my academic career, my focus has been in insurance theory and practice, the economics of risk and insurance, and the public policy aspects of insurance. I have published extensively on various insurance issues, including on matters relating to life insurance products, operations, regulation, and taxation. I taught exclusively graduate-level courses, including in life insurance,

---

[1] The complete citations for abbreviated references such as these are shown in Exhibit A.

for the last 20 or so years of my academic career and have conducted numerous professional development courses and made presentations before professional organizations about various aspects of life insurance.

6.     I am co-author of the leading and oldest university-level textbook on life insurance, *Life and Health Insurance,* now in its 13th edition and translated into Chinese and Japanese. I am also co-author of the recently published textbook, *Risk Management and Insurance: Perspectives in a Global Economy* and author of the forthcoming book, *Life Insurance Due Care,* to be published by the American Bar Association as an aid to attorneys in offering advice to their clients.

7.     In addition to my academic work, I have served as a consultant on various public policy issues in insurance to, among others, the Alabama and Virginia Commissioners of Insurance, the United Nations Conference on Trade and Development, the World Bank, and the Organization for Economic Cooperation and Development.   I am a member of several professional associations and am past President of the American Risk and Insurance Association (ARIA), the world's leading risk and insurance academic association.

## III.   Life Insurance Underwriting

8.     To provide a foundation that I hope will prove useful to the Count in dealing with this case and to deal with the many inaccurate, misleading, and/or unsupported assertions in connection with it, I first explain some of the theory and practice followed by life insurance companies in underwriting life insurance policies.

### A.  Nature and Purpose

9.     "**Underwriting** is the process by which an insurance company decides whether to issue requested insurance and, if it decides to issue it, on what terms and conditions and at what price."[2]  Note that this definition incorporates two elements: (1) determination of whether the insurance company is willing to issue the requested insurance – called **selection** – and (2), if willing, determination of the terms, conditions, and premium rate to be applied – called **classification**.

10.     The persons within life insurance companies who are charged with making the decision whether to issue the requested insurance, in what amounts, on what terms and conditions, and at what price are called **underwriters**.  For personal life insurance, underwriters secure information that falls into three broad categories in making their underwriting decisions:

1.     **Medical characteristics.**  An individual's medical characteristics are essential for assessing likelihood of death is obvious.

2.     **Lifestyle characteristics.**  I use the term "lifestyle" to encompass a range of factors, including occupation, avocation and sports, aviation, residence, military service, and drug use.

3.     **Financial characteristics.**  Financial information includes the rationale justifying the purchase of the requested insurance, including the rationale for the beneficiary designation and policy owner (if different from the insured).  It also includes information about life insurance already in force and in process as well as the proposed insured's net

---

[2] Black and Skipper, p. 633.

worth and income in relation to the amount of insurance requested, in force, and in process.

11.     Underwriters' jobs are to apply their knowledge of the relationships between various medical, lifestyle, and financial factors and mortality.  They try to match the unique characteristics of each proposed insured with those equivalent factors in the underlying information and data on which they rely – if they can – and, thereby, derive an estimate for life expectancy for proposed insureds possessing those characteristics.  In effect, underwriters want to know that the deal that the proposed insured wants to enter with the insurance company is the same as the one that they believe they are entering.  To do so, they need to know everything that the proposed insured knows that might be relevant to assessing the risk that they are undertaking.

12.     Underwriters do not claim to be able to determine whether any of the specific medical, lifestyle, or financial characteristics of a given person will necessarily shorten that person's life. They do strive to determine whether and the extent to which the characteristics of a given person have been found to shorten the lives of the universe of persons who possess those characteristics.

13.     In some instances, the underwriting decision is to refuse to issue any insurance. **Classification-based denials** occur where the characteristics of a proposed insured match with the group of persons whose expected mortality experience is higher than the maximum substandard classification that the company accepts.[3]  Life insurance companies typically will not issue life insurance if a proposed insured's characteristics are consistent with the group of persons whose likelihood of death is greater than 10 times that of the average likelihood of death (i.e., expected mortality of 1,000 percent of standard mortality).

14.     With **selection-based denials**, the underwriter is unable to match the proposed insured's characteristics with any group, because unresolved concerns or inconsistencies exist in the application material.  The case does not advance to the classification phase, as no assessment can be made as to which mortality group the proposed insured's characteristics place him or her.  For example, insurance companies decline to issue insurance if the beneficiary designation is illogical, a questionable insurable interest exists, or the amount of requested insurance is excessive.  Selection-based denials usually arise in the financial underwriting aspects of a case.

### B. Financial Underwriting

15.     All life insurance companies request information about their proposed insureds' financial characteristics, with the possible exception of underwriting small policies.[4]  The greater the insurance amount requested, the more important this information will be to life insurance underwriters.  In deciding whether to issue life insurance and the amount to issue, life underwriters think in terms of the insurance being indemnification for a possible economic loss to the beneficiary.  Property insurance underwriters think in the same way.  They insist that the requested amount of insurance bears a reasonable relationship to the loss that the insured would suffer were the building to be destroyed, which is, at most, its replacement cost.

16.     Life underwriters similarly insist that the total amount of insurance bears a reasonable relationship to the expected economic loss that the beneficiary would suffer were the insured life

---

[3] "Substandard" is the not-so-pleasant industry term for those insureds whose expected mortality is higher than "standard" or, roughly, average mortality.  Substandard mortality cells or classifications range from about 125 percent of standard to 500 (or even 1,000) percent of standard.
[4] See Black and Skipper at 653-656 for more about financial underwriting.

to be "destroyed." This amount is, at most (economically speaking), the replacement cost of the financial benefit that accrues to those who would be adversely affected financially by the insured's death.[5]

**17.** No reasonable life or property insurance company will knowingly issue an insurance policy in an amount that results in total coverage being greatly disproportionate to the financial impact that would result *to the payee* from the "total destruction" of the object of the insurance, whether that object is a life or a building. If the payee – ordinarily the insured under property insurance policies and the beneficiary under life insurance policies – would suffer no financial loss from such a total destruction, the insurance company will refuse to issue any insurance.

**18.** The two most common reasons for the purchase of personal life insurance are to (1) replace income lost to survivors and (2) pay estate obligations occasioned by the death of the insured person. For the first category, insurance companies commonly use so-called income multiples as guidelines for the total amount of life insurance that they will agree to issue. For example, one company provides that it will not issue an amount of life insurance to a 51 year old person in excess of 10 times his or her annual earned income. From the underwriter's viewpoint, the insured's early death should not result in a greater income to the beneficiary than that which he or she would have received had the insured not died. Insurers view this type of financial information as crucial in deciding whether to issue insurance and how much to issue on applications in this first category.

**19.** For the second category, estate obligations can be in the form of debts, such as home mortgage loans, and/or estate conservation costs. Wealthy individuals often purchase insurance to cover some or all of these estate costs, the most important of which are estate taxes. Life insurance agents and companies will use different terms in the underwriting process to signal that the insurance is intended to cover estate taxes, including estate planning, estate liquidity, estate preservation, estate settlement, estate conservation, and others, but they all mean the same thing. While companies have different approaches to estimating this amount, a common approach is to estimate the future value of a gross estate (net worth) by projecting today's value at a reasonable accumulation rate to the life expectancy of the proposed insured or for a number of years less than that life expectancy. The tax is then estimated on that projected value or some percentage of it.

**20.** The table below shows the guidelines and suggested procedures recommended by several life insurers. This table shows what is the universally accepted practice in the life insurance industry of relying on the present net worth of proposed insureds in deciding whether to issue insurance and, if so, the amount.

---

[5] This statement is not meant as an absolute but rather to offer the flavor of what actually transpires with a typical application. Thus, for example, insurance companies will issue modest amounts of life insurance on the lives of minor children even though their deaths may have little or no financial impact for the parents.

| Company | Beginning value? | Accumulate beginning value at ... | Accumulate beginning value for ...[6] | Estimate final insurance amount by taking ... |
|---|---|---|---|---|
| AXA Equitable | Current estate value | Usually 7% | ½ of client's LE | 55% of accumulated value |
| ReliaStar | Estimated value of gross estate | 7-10% | Lesser of 15 years or client's LE | 50% of accumulated value |
| John Hancock | Net worth | 6-8% | Lesser of 20 years or ¾ of client's LE | 50% of accumulated value |
| Lincoln Financial | Estimated value of gross estate | 6% | ¾ of client's LE | 55% of accumulated value |
| SBLI of Mass. | Net worth | n.a. | n.a. | greater of current net worth or 5 times salary |
| Security Life of Denver | Estimated value of gross estate | 7-10% | Lesser of 15 years or client's LE | 50% of accumulated value |
| Security Mutual | Net worth | n.a. | n.a. | current estate and other death tax rates times net worth |
| Swiss Re | Net worth | 5-10% | Lesser of 10 years or client's LE for clients older than 65 | 75% then 50% of accumulated value |

21.     When life insurance is being purchased to cover estate liquidity costs (and the proposed insured is otherwise insurable), the value of the proposed insured's estate or, equivalently, net worth is *the* determining factor for deciding on the maximum amount of insurance to issue. That is the reason why the underwriting of applications for estate planning purposes always involves questions about income and net worth. If a proposed insured's death would create little or no estate liquidity costs – because the estate value was too small – underwriters decline to issue any insurance for that purpose.[7] If a proposed insured's death would create meaningful estate liquidity costs, underwriters will agree to issue insurance but only for an amount predicated on those costs; i.e., derived from the proposed insured's net worth.

22.     Based on my experience as an academic studying life insurance theory and practice for decades and as an expert witness for other cases involving questionable insurable amounts, I find the guidelines shown in this table to be representative of those found and followed broadly in the U.S. life insurance industry. This contention is reinforced by the inclusion of Swiss Reinsurance Company in the table. Hundreds of life insurance companies worldwide and in North America follow or pattern their underwriting guidelines on those suggested by Swiss Re, including the

---

[6] LE = life expectancy.
[7] They might approve issuance of insurance for other purposes, such as income protection, but the maximum acceptable amount is determined using different metrics, with the requirement that a clear need be established.

largest North American life insurer, MetLife.[8]   Thus, Swiss Re's guidelines are especially relevant and likely the most representative of the U.S. life insurance industry.  In 2005-06, Swiss Re wrote more than a quarter of all reinsurance written on U.S. life insurers.[9]

**23.**   Irrespective of whether the requested life insurance is to provide family income, pay debts, or cover estate taxes on the insured's death, if that amount is disproportionately large compared with the maximum estimated financial impact that the person's death would have on heirs, insurance companies simply will not agree to issue the insurance.  This is because they are unable to resolve the obvious inconsistency between the estimated financial impact created by the insured's death and the insurance amount requested.  The underwriting cliché that insurance companies diligently seek to avoid situations where an insured would be worth more dead than alive harbors much insight.

### C.  The Importance of Insurable Interest

**24.**   All states require the existence of an insurable interest in the proposed insured by the applicant (proposed owner), the beneficiary, or both at the inception of a life insurance policy. Insurable interest requirements are most commonly justified on public policy grounds, but their rationale is firmly grounded in economics as well.  Broadly stated, an applicant or beneficiary has an insurable interest in a person if he or she has an economic reason for wanting to keep the person alive and not benefiting from the his or her premature death.

#### *1. Background*

**25.**   The requirement for the existence of an insurable interest at life insurance policy inception traces its origins to a 1774 law enacted by the British Parliament that declared policies procured without a valid insurable interest to be null and void.  Insurable interest requirements became widely adopted in the early U.S., often not via statute but by "judicial application of the public policy against the enforcement of wagering contracts."[10]

**26.**   Two cases established firmly both the context and scope of insurable interest requirements in the U.S.  In *Warnock v. Davis*, the U.S. Supreme Court set out in its 1881 opinion the necessity for and parameters regarding insurable interest when it observed:

> It is not easy to define with precision what will in all cases constitute an insurable interest, so as to take the contract out of the class of wager policies.... But in all cases there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some kind of benefit or advantage from the continuance of the life of the assured. Otherwise the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured.  Such policies have a tendency to create a desire for the event.  They are, therefore, independently of any statute on the subject, condemned as being against public policy.[11]

**27.**   The Court, in objecting to wagering on human life, placed insurable interest requirements in the wider realm of public policy.  The Court insisted on an expectation of "some kind of

---

[8] https://mli10.investmnet.com/cache/doclib/LifeMarketing/LMN/07MayTHE%20GUIDEIDG.pdf
[9] http://www.wikinvest.com/stock/Reinsurance_Group_of_America_(RGA).
[10] Dan M. McGill, *Life Insurance* (Revised ed.; Homewood, IL: Richard D. Irwin, 1967), p. 502.
[11] 104 U.S. 775, 779 (1881).

benefit or advantage from the continuance of the life of the assured." The issuance of a life insurance policy was to be "condemned" if it were for purely commercial purposes independent of such an expectation.

28.     The Court's later opinion in the landmark 1911 case of *Grisby v. Russell,* authored by Justice Oliver Wendell Holmes, Jr., confirmed the underlying insurable interest standard set out in *Warnock* while establishing clearly that a life insurance policy should, "so far as reasonable safety permits," be treated as any other property as concerns the transfer of ownership of an otherwise valid policy to someone with no insurable interest in the insured.[12] The Court said: "To deny the right to sell except to persons having such an interest is to diminish appreciably the value of the contract in the owner's hands." Thus, in today's context, the Court presumably would have found nothing offensive with life insurance policies procured in good faith at inception later being sold.

29.     Justice Holmes qualified the ruling by noting that it applied only where "an honest contract is sold in good faith" and that it expressly did not apply to situations in which "a person having an interest lends himself to one without any as a cloak to what is in its inception a wager."[13] Thus, the existence of a facially valid insurable interest at contract inception is not determinative if a later transfer of beneficial interest was for the purpose of vitiating the initial insurable interest requirement. In today's context, perhaps the Court would have found STOLI transactions offensive, as explained below at paragraphs 43-47.

### 2.   The Public Policy Rationale for Insurable Interest Requirements

30.     At least two different public policy justifications exist in support of insurable interest requirements. The first justification is that wagering on human life is objectionable to society, independent of any other factor. Thus, contracts entered into for the purpose of creating such a wager should not be enforceable, precisely because they are offensive to societal norms. The U.S. Supreme Court, in objecting to wagering on human life, seemed to place the insurable interest concept squarely in the public policy domain.

31.     The second public policy justification for the existence of insurable interest is that its absence can create an incentive to murder. "[T]he policy of the law requires that the assured shall have an interest to preserve the life insured in spite of the insurance, rather than to destroy it because of the insurance."[14] While the incidences of policies being acquired for this purpose are rare in comparison to the total number of policies issued each year, they are, nonetheless, of sufficiently large number to fill pages of a Google search of "murder and life insurance."

### 3.   The Economic Rationale for Insurable Interest Requirements

32.     Independent of the public policy rationales underpinning insurable interest requirements, at least three economic rationales support them. First, the absence of an insurable interest is likely to create a moral hazard situation. **Moral hazard** in insurance is the tendency of individuals to alter their behavior *because* of insurance. Thus, consumers who stand to collect more in disability income insurance benefits than they would earn in wages are more likely to become "disabled." Moral hazard also exists with life insurance. The lack of any economic (or

---

[12] 222 U.S. 149, 156 (1911).

[13] *Id.*

[14] Anderson, p. 362.

other) interest by a beneficiary in the continued life of an insured has, as the U.S. Supreme Court observed, "a tendency to create a desire for the event."

33.     In noting this tendency, economists would argue that the Supreme Court was embracing the concept of moral hazard. This tendency can manifest itself, not only in murder, but also in failing to do all that one reasonably could to keep the insured alive. Of course, this economic rationale reinforces the public policy rationale against allowing contracts that might increase the likelihood of murder. The difference is that insurance companies have natural economic incentives to try to detect and deter incidences of moral hazard, even in the absence of the public policy rationale, but they are not always successful in doing so.

34.     The second economic rationale for a requirement for an insurable interest is that its absence can create negative externalities. A **negative externality** exists when an individual's or a firm's activities impose uncompensated costs on others.[15] Pollution is perhaps the most commonly discussed negative externality. From an economic perspective, murder imposes uncompensated costs on both survivors and society, and contracts that might increase the incidents of murder or hasten death place economic costs on both survivors and society, irrespective of any criminal sanctions imposed.

35.     A third economic rationale for insurable interest requirements rests in its **reputational effects** on the life insurance industry as a whole. Without such standards, life insurance could come to be viewed more as a commercial undertaking than as a means of providing for one's family on death. The *Warnock* Court's admonition that the issuance of a life insurance policy was to be "condemned" if it were for purely commercial purposes seems on point. The economic effect of this possible alteration in public perception could be to dampen the industry's reputation and, thereby, reduce the appeal of life insurance as an instrument for providing family security. This reduced industry reputation and reduced demand for life insurance might spill over to other economic security products offered by life insurance companies such as annuities, pensions, and health insurance.[16]

36.     From an economic viewpoint, individuals who acquire life insurance policies possessing a legitimate insurable interest at inception ordinarily may treat their policies as they treat any other property, subject to the Court's admonitions. If the policies were, however, acquired at inception by a person with a facially valid insurable interest but with the intent and for the purpose of later selling them to persons without such an interest, the transaction would suffer from the same adverse economic consequences identified above. It is economically the same as someone with no insurable interest at inception buying a policy on a person's life. It would be the economic equivalent to "a cloak to what is in its inception a wager."[17]

## IV.    The Secondary Life Insurance Market

37.     The market for life insurance policies purchased from insurance companies is called the **primary life insurance market**. The market in which existing life insurance policies are bought and sold is called the **secondary life insurance market**. With the HIV/AIDS crises of the

---

[15] Skipper and Kwon, p. 49.
[16] Such a situation occurred after the 1905 Armstrong Investigation in New York, when the reputations of the life insurance companies criticized in the Armstrong Committee's report were sullied and they lost business. See Anderson, pp. 13-14.
[17] *Id.*

1980s, the secondary (also called viatical) market for life insurance arose that allowed infected insureds to sell their policies for amounts greater than the cash values. These sales were labeled **viatical settlements** or simply **viaticals.** At that time, an AIDS victim's life expectancy was about two years. Naturally, the economic or fair market value in the secondary market of a policy insuring an AIDS victim was quite high; far higher than that which could have been realized by terminating the policy for its cash value.

38.   As the viatical market dried up with improvements in HIV/AIDS treatment, entrepreneurs then shifted from buying policies on terminally ill insureds to buying policies on those whose health had become merely impaired. Sales of such policies are commonly known as **life settlements** to distinguish them from viaticals. Except for tax and regulatory matters, the dividing line between viaticals and life settlements is arbitrary, and both terms today are understood to refer to sale of an existing life insurance policy in the secondary market.

39.   Life settlements, like viaticals, have been associated with considerable fraud and incomplete disclosure.[18] Concerns about fraud and inappropriate sales practices led the National Association of Insurance Commissioners (NAIC) to amend its 1993 *Viatical Settlements Model Act* in 2007 and the National Conference of [state] Insurance Legislators (NCOIL) to adopt its own model act, also in 2007, the *Life Settlements Model Act.*

## A. The Process and Economics of Life Settlements

40.   The secondary life insurance market, as with all markets, relies on willing buyers and sellers arriving at agreeable prices. If both buyer and seller are acting at arm's length, the agreed upon price would be considered to be the policy's fair market value.

41.   Many insureds suffer from deterioration in health. It is from within this group that we find the main market for life settlement firms. They seek insureds whose health has deteriorated beyond that implicit in insurers' pricing. Such policies' economic or fair market values should be greater than their cash values. If such policy owners need or wish to terminate their policies because they are no longer needed for some reason, selling their policies to life settlement firms, rather than surrendering them, may be a smart economic decision.

42.   The typical target insured is age 65 or older whose health has deteriorated. The policy face amount is large (typically $1.0 million and greater), and the insurance is no longer needed or wanted. The objective of the settlement firms (or the speculators to whom the policies are then sold) is to acquire portfolios of life insurance policies and, thereby, to earn profits from the death benefits that they receive under the policies being greater than that which they paid to acquire and maintain the policies.

## B. "Stranger-Owner Life Insurance" (STOLI)

43.   We know that individuals who acquire life insurance policies possessing a legitimate insurable interest at inception are free to dispose of them in whatever way they may wish, including selling them in the secondary market via a life settlement. These types of sales occur regularly. So long as the policy was acquired originally for legitimate purposes and not "as a cloak to what is in its inception a wager," the policy is freely transferable at any time, including before the period of contestability has expired. However, a policy procured with the intent – at inception – that it would be sold to someone with no insurable interest seems to be inconsistent

---

[18] Matthew Goldstein, "Profiting from Mortality," *BusinessWeek* (July 30, 2007).

with insurable interest requirements. It is in this shady realm that we encounter "stranger-owned life insurance" or STOLI.

44.     STOLI-related applications to life insurance companies flow mainly from older individuals who have been convinced, usually by a relative who in turn has worked with a STOLI promoter, to apply for large amounts of life insurance whose falsely stated purpose in the application is to cover what they assert will be the high costs of settling their large estates. Life insurance to cover estate taxes has been a popular estate planning tool and routinely issued for decades. The situation began changing dramatically in the 2004-05 period. Family members and investor/promoters began convincing elderly parents and grandparents to apply for these large policies, not for true estate conservation purposes, but for the purpose of selling the policies to unknown investors ("strangers"). The intent was to treat the policies as financial commodities and sources of profit. This true purpose is never disclosed to the life insurance companies. The value of the proposed insured's net worth is commonly grossly overstated, as in this case, to convince the companies to issue much more insurance on the person's life than they would otherwise.

45.     Life insurance companies will not knowingly issue STOLI-driven policies for at least two reasons: (1) the nature of the risk in STOLI policies is different from that which the insurance company has priced within the policies and (2) they believe such policies are wagers, not bona fide life insurance, and could run afoul of insurable interest requirements. Even if such policies were "legal" and were adjudged to have met insurable interest requirements, companies still would decline to issue them because of pricing concerns, among other reasons. These other reasons include the fact that such applications always involve material misrepresentations.

46.     To get around the obstacle of insurance companies discovering that a policy application is STOLI driven, the involved parties employ several techniques in an attempt to disguise their involvement.[19]   These include investors not buying the policy until after the period of contestability (ordinarily, two years) has expired.[20]  Other common traits of STOLI transactions include or formerly included the following:

- The typical targeted individual has a high net worth or professes to have one and is 70 or older.

- The application and supporting documentation indicate that the life insurance is for estate preservation or equivalent-sounding purposes.

- The insurance amount is "large" in comparison with typical life insurance policies – in the millions of dollars.

- The beneficiary and policy owner are someone with a facially valid insurable interest, either the insured or an entity commonly identified with estate planning, such as a trust or an LLC.

---

[19] "STOLI marketers prefer that insurers are kept in the dark about a senior's intention to transfer the policy, as this is a tip-off for a STOLI scheme." *Senior Advisory on STOLI or SPINLIFE Life Insurance Schemes* at http://www.insurance.ca.gov/0100-consumers/0250-seniors-issues/senior-stranger-owned-life-insurance.cfm.
[20] STOLI advocates contend that waiting until the period of contestability has expired provides them with greater assurance that the validity of the contract cannot be successfully contested, so their investment in it is less risky.

- If an entity is owner and beneficiary, it commonly will have only recently been created, often contemporaneously with the insurance application.

- Multi-million dollar applications commonly are completed for several insurance companies, more or less at the same time, but with this fact not always fully disclosed to the insurance companies or, if disclosed, the insurance agent commonly contends that he or she is simply shopping for the best deal for the client and does not intend to buy all policies offered – which is not true.

47.    Arguably, STOLI transactions are wagers on human life and are not valid life insurance as the intent from policy inception is to sell the policy to those who lack a bona fide insurable interest.  This trait is not a characteristic of generic life settlements.  Further, from the life insurance industry's viewpoint, they impose great costs on the industry, as the insurance companies' assumptions in pricing their policies do not match the reality of STOLI policies, as explained below at paragraphs 76-89.  In effect, the fair market value as believed to prevail by the issuing life insurance company becomes quite different from the fair market value as known by the STOLI investor/promoters.  Besides possible differences in mortality and lapse experience, additional costs are incurred by the industry (and ultimately its customers) because of the need to engage in more in-depth underwriting in an effort to ferret out such (disguised) applications and because of the expenses incurred in connection with insurance company efforts to rescind such policies.  The insurance industry has made diligent efforts to identify and then rescind STOLI-driven policies.  Efforts in this respect have progressed markedly from 2005 to the present.

## V.    Inaccurate, Misleading, and/or Unsupported Assertions by Defendant

48.    In considering the various approaches that can be used to estimate the expected and actual economic losses to the life insurance companies in this case, it became clear to me that certain inaccurate, misleading, and/or unsupported assertions within the *Sentencing Memorandum* and the *Gober Report* quoted therein should first be pointed out to the Court.  I was concerned that these dubious and inaccurate assertions might otherwise be taken at face value, which would not serve justice.  These assertions are made in an effort to suggest that the insurance companies suffered little or no losses.

49.    The defendant would have the Court believe that all sales of life insurance policies in the secondary market are the same.  They are not, as the immediately preceding discussion made clear.  The following statements shown in italics are direct quotes from the *Sentencing Memorandum* (indicated below as *Memo*) and the *Gober Report* as quoted in therein whose intentions seem to be to mislead and misinform the Court.  I analyze each statement immediately afterward.

50.    *These [nine] policies [insuring the life of Helen Eckstein] were entered into, not as traditional life insurance policies, but rather an investments.* [Memo at 4.]

I assume that this statement is intended to justify the purchase as being legitimate in some way.  It does not.  Insurance companies do not knowingly sell policies as an "investment," which in this case is code for STOLI; i.e., purchased through misrepresentation for the purpose of being sold to stranger investors.

**51.**     *Life settlements generally involve the purchase of a large life insurance policy by an elderly individual (or more often, by individuals acting on the insured's behalf).  That policy is then held by the insured (or his representatives) during the period of contestability.... In these life insurance investment settings, once the period of contestability has run, the owner of the policy will sell it in the life settlement market. [Memo at 5.]*

As explained above, combined with the concealment of the true purpose for which the policy is being purchased, i.e., as an "investment" wager on human life, the quoted statement is not the definition of a life settlement but rather that of a STOLI transaction. Generic life settlements do not necessarily involve elderly persons nor do they necessarily have anything to do with the period of contestability, both of these traits being characteristics of STOLI not life settlements generally.

**52.**     *In an article published in the* Economist *in June of 2009, the author estimated that the life settlements industry had grown to.... [Memo at 6.] In fact, the New York Times recently reported that a number of major Wall Street firms.... [Memo at 6.] In recent research related to life settlements I learned that the, then, largest insurer, AIG, had a subsidiary that accumulated and securitized the largest block of "life settlements" in history.  [Memo at 18 from Gober Report.]*

Each of these references relates to generic life settlements and specifically not to STOLI transactions.

**53.**     The defendant would also have the Court believe that life insurance companies knowingly consent to issue life insurance policies that are intended at inception to be sold in the secondary market and that they care little or nothing, in reality, about the net worth information in connection with a policy sold ostensibly for estate preservation purposes, as in this case.  I have neither heard nor read of a single life insurance company that will knowingly issue a policy which it has reason to believe is being purchased for purposes of being sold in the secondary market, even if it does not involve misrepresentation.  Moreover, I am aware of no company that would fail to request and use net worth information in connection with underwriting an application such as this one, and all companies in this case did secure such information.

**54.**     *...the insurance companies at issue in this matter were well aware, through their insurance agents or otherwise, that these insurance policies were likely destined for the "life settlements" secondary market. [Memo at 17 from Gober Report.]*

First, I have no information and the expert cites to no record that supports the notion that the insurance companies "were well aware" of the policies being destined for the secondary market.  Life insurance companies will not knowingly issue life insurance policies destined for the secondary market.  Second, if the defendant's intent by insertion of "through their insurance agents" is to impute knowledge of the fraud to the insurance companies by virtue of the agent having knowledge of it, he similarly fails to cite to anything that supports this contention.  Third, even if it were true that the agent knew of the fraud, this fact alone surely would not impute knowledge of it to the insurance company.  If the agent was involved in the fraud, he would have been engaging in activities outside the scope of his express, apparent, or implied authority.  Insurance companies are not bound by such activities nor is knowledge of them properly imputed to them.

55.    *In most instances, the agent will actually fill out the insurance application (as was true in the instant case, indeed, the applications in this case were all written in the agent's own handwriting) and then he will simply send the necessary signature pages to the elderly person (or their representative).* [*Memo* at 9.]

> First, the great majority of life insurance applications involving an agent are indeed completed by the agent. This proves nothing. The agent ordinarily asks each question on the application then records the proposed insured's and applicant's answers to them. Thus, that the agent "will actually fill out the insurance application" is unremarkable, as is the fact that the "agent's own handwriting" appears in the application. This is normal. Second, no citation to the record is offered for the assertion that (presumably only) signature pages are or were sent. Third, even if they were sent in this way, we do not know whether the applications were completed in response to the agent's questions. Fourth, STOLI-driven applications, by definition, involve enormous efforts by those involved in the schemes – sometimes including agents and often family members – to hide from the insurance company the true nature and purpose for the insurance.

> Finally, to try to make the agent the scapegoat seems disingenuous on its face. Agents in STOLI situations do not ordinarily, out of the blue, approach relatively poor, elderly people unrelated to them who speak little or no English and convince them to engage in multi-million dollar fraud, as are the characteristics of this case. Someone else, in a position of trust with the elderly person, inevitably must be intimately involved – in this instance, the defendant. Indeed, the defendant is the investor who expected to reap enormous profits from the transactions. He put his own money into the scheme as well as that of his partners, and he expected to make a profit from it. It is as if the defendant is asking the Court to believe that he had nothing to do with the applications and was completely in the dark as to what was intended and the means of accomplishing it. Were he so innocent, why did he sign applications and other material attesting to the accuracy of all supplied information? Whether he signed completed applications containing false information or blank applications containing no information seems to be irrelevant. In either instant, he misrepresented the truthfulness of the information on the application.

56.    *In instances where the insurance application requests information about the putative insured's net worth – it is not uncommon for the agent to unilaterally create that information on the application. Indeed, in this case all of the net worth information set forth on the applications was supplied – unilaterally – by the agent.* [*Memo* at 9.]

> First, the defendant's implication that life insurance agents commonly invent the answers to questions on life insurance applications is grossly unfair to the great majority of agents. Most agents are like the masses of other workers in the U.S., hardworking, essentially honest people, and the defendant offers no support for a contrary position. Further, agents who engage in such activities are routinely terminated, and other life insurance companies generally will not hire them. Second, we should realize that what the defendant describes here is "STOLI-in-action." It is common for STOLI applications to contain material misrepresentations, fostered by the promoter/investors (defendant). STOLI applications commonly involve fictitious information in an effort to convince insurance companies to issue excessive amounts of life insurance. Third, the assertion in the context of ordinary (non-STOLI) life insurance applications is unsupported by any

citation to the record or any other source and, based on my experience and knowledge, is simply wrong. Agents do not commonly create fictitious information. Finally, to repeat the same theme mentioned above, the defendant is the one who stood to make the big money from these deals. The agent makes a handsome commission on the original policy sale but does not share in the expected large profits. We are again being asked to suspend belief and ascribe all things bad to the agent, not the defendant, who was, presumably, just an innocent onlooker (who signed documents attesting to the truthfulness of everything contained in the applications).

57.    *At the same time the application(s) are being prepared, an agent will typically have an attorney – whom he has worked with on previous occasions – draw up a trust which will be designated as the beneficiary of the life insurance policy. The trustee will be an individual ... who is related to the insured (in this case Mr. Vaysman), thereby satisfying the "insurable interest" requirements of* New York Insurance Law § 3205. *[Memo at 9.]*

This is another depiction of a typical STOLI-driven transaction and, based on the record that I have seen, also of this case in which a trust is created for the sole purpose of obscuring from the insurance company the underlying nature of the transaction. The trust has no estate planning use, contrary to what will have been asserted within the insurance application and supporting materials and contrary to bona fide life insurance estate planning trusts. Again, it seems that we are meant to believe that the defendant had little or no involvement in these arrangements, even though he was the one who stood to profit handsomely from it and the one who signed not only the insurance applications but also signed documents creating the trust.

58.    *Not all life insurance companies even ask about the proposed insured's net worth* [footnote: *Even though the Lincoln Life Insurance applications did make inquiry concerning the proposed insured's net worth, it does not appear that any net worth information was supplied with respect to Lincoln Life policies LF5513692 or 5513690.] For example, the applications for New York Life policies obtained in this case... make no inquiry as to net worth. [Memo at 10.]*

First, no justification or citation to the record or to any other source is offered for this assertion that "not all life insurance companies even ask...." Second, I am unaware of any life insurance company that does not request financial information about the proposed insured, except sometimes for small policies. Third, contrary to the implication that no net worth information was supplied with regard to the two Lincoln Life policies, such information was requested and supplied by the defendant.[21] Fourth, contrary to the implication that New York Life did not request net worth information, such information was requested and supplied by both the defendant and the agent.[22]

59.    *In any event, it seems fair to observe that even with respect to those life insurance companies that sought net worth information on their applications, they self-evidently assigned a very lower materiality to this information, since in every instance, no Equifax or other readily*

---

[21] Jefferson Pilot Financial (Lincoln), *Amendment to Application for Insurance*, Policy No. LF5513690 and Policy No. LF55133692, both dated April 7, 2005 and signed by the proposed insured and the defendant.

[22] New York Life Insurance Company, *Financial Statement to Application*, Helena Eckstein, dated August 29, 2005 and signed by the proposed insured and the defendant and *Agent's Report* dated August 29, 2005 and signed by the agent.

*available credit verification was ever sought or made, nor was the putative insured ever asked to provide corroboration of any kind of the stated net worth* [footnote omitted]. [*Memo* at 10.]

First, all companies sought and received net worth information. Second, no justification or citation to the record is offered to support this assertion that no "verification was ever sought or made". Third, contrary to the statement that "no Equifax or other readily available credit verification was ever sought or made", many and possibly all of the insurance companies obtained such inspection reports.[23] Fourth, at the time of these applications (2005), the underwriting guidelines of some companies did not require inspection reports in all estate planning cases, as the STOLI issue was then somewhat "below the radar" of the insurance industry. Fifth, after some and perhaps all of these companies as well as many others discovered that they had been taken in through STOLI ruses, they instituted more stringent underwriting procedures and guidelines to protect against the inadvertent issue of such policies. They also undertook programs to try to identify likely policies that had been issued in the past that might be STOLI and to rescind them if feasible. For example, at great expense, New York Life identified some 200 policies as being possibly STOLI, successfully rescinding 100 of them. John Hancock, MetLife, and Jefferson Pilot/Lincoln Financial also have undertaken significant steps to rescind policies that the later discovered to be STOLI.[24]

60.    *...it is vital to bear in mind that when the insurance companies issued these policies the companies made informed decisions (based upon accurate information supplied) as to whether it made economic sense to write a large policy for an elderly person.... Most respectfully, the risk of loss analysis did not include the putative insured's net worth....* [*Memo* at 14-15.]

First, contrary to this assertion, no insurance company in this case "made informed decisions (based upon accurate information supplied)". All were provided with completely false and misleading information about the proposed insured's net worth as well as the underlying purpose for these policies. The defendant's underlying purpose for the insurance was stated to be for estate conservation. Had the insurance companies known of the proposed insured's true net worth or the underlying wagering purpose for the insurance, not one of them would have agreed to issue a policy for any amount. Indeed, lies about net worth typically are a sign that the policy is, in fact, STOLI and is intended as a wager. Second, no justification or citation to the record is offered that the insurance companies "loss analysis did not include the putative [sic] insured's net worth." While I do not have information about how these insurance companies underwrote these cases, the typical such insurance company would certainly have taken net worth into account, as explained earlier in this report.

61.    *...in at least one instance, the insurance company benefitted significantly from the transaction and in the other instances not one company has actually lost any money. Furthermore, it is my professional opinion and experience that if the policies remain in force, the insurance companies will likely make money.* [*Memo* at 17 quoting *Gober Report.*]

First, defendant's expert cites to no record and offers no actuarial or economic analysis or even logic in support of the assertion that one of the insurance companies "benefitted

---

[23] Discussion of April 9, 2010 with Charles Kleinberg.
[24] *Id.*

significantly from the transaction" or that "not one company has actually lost any money." Further, based on typical life insurance company product pricing, I would be surprised if any of the insurance companies has yet to achieve breakeven – meaning that the insurance companies were no longer in a negative financial position with regard to the block of policies to which each of the policies in this case belongs. This is because insurance companies incur substantial front-end costs in putting policies on the books, and they take years to amortize these costs. It is not unusual for cash value policies to achieve breakeven not earlier than five and as many as 15 years after issuance.[25] If the expert is referring to any policies that have lapsed (voluntarily terminated by the policy owner), then his assertion of a "benefit" is almost certainly wrong as early lapses almost always create losses for insurance companies. Second, defendant's expert offers no actuarial or economic support or citation to the record or any other source in support of the assertion that "the insurance companies will likely make money." It is simply a naked, wholly unsupported, unhelpful assertion.

62.     *A proposed insured's net worth is typically a fluid amount.  If the proposed insured's portfolio of stocks or real estate suffers a sudden swing, it could be radically altered over night.* [*Memo* at 17 quoting *Gober Report.*]

Both the proposed insured (Helena Eckstein) and the defendant signed applications attesting that Mrs. Eckstein's net worth was either $34 or $62 million.  I am informed that her actual net worth was almost certainly less than $5,000 and that, contrary to representations, she owned no real estate or stocks.[26]  Her annual income was no more than $15,000 in 2005, being from Social Security and some type of pension; she lived in federally subsidized rental housing; and she had no will.[27]  This is not the financial portrait of a wealthy person.  Surely defendant's expert is not expecting the Court to believe that Mrs. Eckstein's net worth fluctuated from less than $5,000 to $62 million.

63.     *It is my professional experience that life insurance companies underwrite policies based upon life expectancy and not the value of the insured's asset portfolio.* [*Memo* at 19 quoting *Gober Report.*]

First, as explained at paragraphs 10-23, insurance companies do indeed use estimates of life expectancy in underwriting, but if underwriting information is inconsistent, ambiguous, or incomplete, they cannot estimate life expectancy. Had the defendant been honest with the insurance companies and not lied about Mrs. Eckstein's net worth or the true purpose for which the policy was being purchased, the insurance companies would have declined to issue any insurance,. The underwriters would have concluded that the insurance amount requested was out of all proportion to the underlying insurable value, and they would have been unable to resolve this inconsistency between the insurance amount and insurable value, as there was no way to resolve it. This decision to decline, incidentally, would have been the same for any life insurance application. No insurance company would issue a life insurance policy for any amount if they learn that the net worth figures were as grossly inflated as they were in this case.

---

[25] See Black and Skipper at 775.
[26] Discussions with Charles Kleinberg of April 6 and 10, 2010.
[27] *Id.*

Second, the odd assertion that insurance companies do not underwrite based on "the insured's asset portfolio" is simply wrong.[28] My discussion earlier at paragraphs 15-23 about financial underwriting makes this point. A simple telephone call by defendant's expert to any life insurance company's underwriting or actuarial departments or to any life insurance agent specializing in estate planning or a quick web search, as I conducted to build the table at paragraph 20, would have disabused him of this fallacious notion. The expert's assertion is blatantly false and, to cast it in the most generous light possible, unhelpful in this Court's deliberations.

64.    *The motives of the insurance companies in urging the government to prosecute are, of course, self-evident.  By setting aside these policies in which they have already collected substantial premiums, and further, to be relieved of ever having to pay any death benefits under these policies, the companies achieve a financial windfall. [Memo at 20.]*

Ignoring the issue of motives, the assertion that these insurance companies could "achieve a financial windfall" from somehow "setting aside" these policies is almost certainly incorrect. First, as discussed at paragraphs 85-86, the insurance companies likely are yet to have broken even financially on the blocks of these policies. For example, it would not be uncommon for the first-year commissions paid to the writing agent and his superiors in the marketing channel to exceed the entirety of the first-year premium. Renewal commissions commonly fall within the 5-10 percent range.

Second, I am unsure of the defendant's intended meaning and method of "setting aside these policies". If he intends the phrase to refer to the most common such method, rescission, he is certainly wrong that the companies would achieve a "financial windfall." Life insurance companies return all premiums paid on policy rescission. They, therefore, suffer a considerable financial loss as they are unable to recoup their costs of putting the policies on the books. If defendant intends some other meaning for "setting aside" whereby the insurance companies were permitted to retain all premiums paid, they would simply have lost less money than they would have with a rescission. Third, and of enormous importance, had the insured already died during the terms of these policies, these insurance companies may well have been required or tricked into paying the full death benefits. This viewpoint seems to be the economically correct one to take in this case as the fraud was committed at policy inception, not in March 2010 when the *Sentencing Memorandum* was submitted.

## VI.    Approaches to Estimating Losses to the Insurance Companies

65.    My purpose in examining the above attempts by defendant to paint a picture that does not resemble reality was to lay a sound foundation for this section of the report. I build on that foundation in analyzing the approaches that reasonably could be followed to estimate losses to the defrauded life insurance companies. I am informed that the Court might decide to measure this loss based on what the defendant intended or on the actual loss suffered.

---

[28] The assertion is odd because of the reference to "asset portfolio." I presume the expert means this to be a substitute for "net worth" but, of course, it is not, as net worth equals assets less liabilities. Insurance companies are interested in the composition of a proposed insured's assets, but the amount of insurance that they will agree to issue is a direct function of net worth, not of assets.

66.     I offer one approach that might prove useful in the Court's deliberations in quantifying intended loss. It presumes that the defendant's preferred outcome under the policies would have been that the insured died during the first two policy years. I also offer two other approaches that address actual loss. The first approach follows an actuarial path, taking the perspective of the insurance companies. I include this approach to point out why and how the life insurance companies could be harmed financially from having inadvertently sold the STOLI policies. I intend its benefit to lie in the logic offered as to the insurance companies' sources of losses and not the actual quantification as data do not exist to permit a calculation. Second, I offer an economic rationale for using the defendant's either anticipated or actual gain as a measure of the companies' actual losses.

## A. The Potential Policy Death Benefit as the Driver of Loss

67.     The defendant knowingly and purposefully misrepresented that the proposed insured's net worth was some 7,000 to 12,000 times greater than he knew it to be. Further, he wrongfully asserted that the policies were for estate preservation purposes. Of course, no estate taxes would have been due on Mrs. Eckstein's death. By an elaborate ruse, which at that time (2005) was not well known to life insurance companies but was already prominent in STOLI circles, defendant successfully concealed from the insurance companies the true motivation for the insurance purchases, which was as wagers on the insured's life or, as the defendant characterizes them, as "investments", "not as traditional life insurance policies".[29] Lies about net worth are commonly present with STOLI policies. These policies would never have been issued if the defendant told the truth, and the loss to the insurance companies had she died during the first two years would have been $32.5 million less the premiums paid to that point.

68.     Such situations are now well known to have been sold as "win-win" situations for the participating "investors." The first and most profitable "win" was if the insured died before the two-year period of contestability expired. If the insured did not die during that time, the second hoped-for "win" occurred if the policy was sold in the secondary market. In the first "win," the "investor" makes a financial windfall. In this case, defendant purchased and paid premiums totaling $2,544,208 on nine policies providing $32.5 million of life insurance on Mrs. Eckstein's life. The chart below shows the relevant information. For an "investment" of $2,544,208, defendant could realize a profit of $29,955,792 if his wife's grandmother had died during the first two policy years. Defendant would have realized a return on investment equal to 1,177 percent ($29,955,792 ÷ $2,544,208).

| Insurance Company | Policy Number | Face Amount | Total Premiums Paid | Issue Date |
|---|---|---|---|---|
| Lincoln Financial (JP) | LF-5513692 | $250,000 | $22,510 | April 11, 2005 |
| Lincoln Financial (JP) | LF-5513690 | $1,000,000 | $90,040 | April 11, 2005 |
| Lincoln Financial (JP) | LF-5513686 | $3,750,000 | $337,649 | April 11, 2005 |
| MetLife (Travelers) | 7456944 | $5,000,000 | $253,851 | April 18, 2005 |
| MetLife (Travelers) | 7456941 | $5,000,000 | $260,000 | April 18, 2005 |
| New York Life | 56734523 | $5,000,000 | $455,158 | September 6, 2005 |

---

[29] *Sentencing Memorandum* at 4.

| | | | | |
|---|---|---|---|---|
| New York Life | 56734522 | $5,000,000 | $325,000 | September 6, 2005 |
| New York Life | 56734521 | $2,500,000 | $150,000 | September 6, 2005 |
| John Hancock Life | 59 609 107 | $5,000,000 | $650,000 | July 27, 2005 |
| **Totals** | | **$32,500,000** | **$2,544,208** | |

**69.**     The second and less profitable "win" would occur if the insured did not die during the period of contestability and the policy was sold in the secondary market to speculators.  As explained more fully at paragraphs 97-101, the defendant anticipated paying two years' premiums and receiving an amount equal to 29.5 percent of the policies' death benefit, in which case the return on investment would have been 316 percent, not nearly as good as the first "win" but still an amazing return.

**70.**     We know that life insurance companies try diligently to avoid issuing insurance such that the insured is worth more in death than in life.  A failure in this effort, from their perspective, increases the likelihood of the insurance creating a moral hazard situation in the same manner that of lack of insurable interest does: "the party taking the policy is directly interested in the early death of the assured.  Such policies have a tendency to create a desire for the event."[30]

**71.**     There is no question that, from a financial standpoint, the early death of the insured is the clear preference.  An investor in a position of trust with the insured can do subtle things, perhaps even subconsciously and short of murder that have the effect of hastening or facilitating death, such as not ringing 911 earlier; failing to ensure that she received the best health care; forgetting to repair those hazardous stairs; not discouraging excess drinking or smoking, etc.  The thought might be the benign: "I hope she doesn't die soon, but if she does, here's hoping it's within the next two years."  Grossly overinsuring the life of someone has the "tendency to create a desire for the event."  Insurance companies know this.

**72.**     To the extent that the investor harbors any thought about the first "win" being the preferred outcome, its value to that investor would be enormous.  I understand that the defendant characterized himself as hitting "a grand slam" had Mrs. Eckstein's died during the period of contestability, suggesting clearly this "win" situation as being his preferred.[31]  This fact suggests this measure of loss to be the most relevant of those proposed herein.  The loss to the life insurance companies, however, would have been even greater than defendant's gain, because the two years' premiums that the companies would have received would not have covered their costs in placing the policies on the books.  The companies' losses likely would have been not less than the full death claim payment of $32.5 million.  It is perhaps worth observing the obvious point that these policies would never have been issued and the insurers never exposed to this loss possibility if the defendant had not lied to the companies.

### B. The Differences between the Values of the Deals: An Actuarial Approach

**73.**     With STOLI transactions, including the one here, the insurance company and the applicant (here, defendant) have quite different views as to the nature of the deal they intend and

---

[30] *Warnock v. Davis,* 104 U.S. 775, 779 (1881).
[31] Discussion with Charles Kleinberg of April 12, 2010.

believe that they are undertaking. Of course, only the applicant knows the true nature of the deal.

74.     The deal that these insurance companies believed that they were making was the sale of life insurance policies at a fair (primary) market price for the common, legitimate purpose of paying estate taxes. They had no idea that the policies were, in fact, being purchased as "investments," to be held for two years unless the insured died during that time period, then sold at a much higher fair (secondary) market price to individuals having no insurable interest in the life of the insured and for purposes that had nothing to do with her estate and its liquidity needs. The purchase was a wager by the defendant on the life of his wife's grandmother.

75.     This difference between what the insurance companies believed they were selling and what the defendant knew he was buying imposed costs on and reduced gains to these insurance companies. These losses and foregone gains arise from the fact that actual experience under policies purchased in a STOLI context such as this one will differ from that assumed by the actuaries in the pricing of policies sold for ordinary purposes. I set out below the areas in and logic by which we reasonably expect these actuarial differences to manifest themselves in cases such as this. The value of this exercise is in offering the logic for losses and not the actual calculation of them here. Even if such calculations could be made, which is not the case given data limitations, the later sections that present an economic approach to valuing the companies' losses provide superior, market-based metrics for establishing the value of those losses. Life insurance companies do not have credible data relevant exclusively to STOLI policies and, so long as misrepresentation is involved in their acquisition, the companies never will have credible data. There are clearly losses caused by STOLI, but they cannot be measured with any degree of precision taking an actuarial, bottom-up approach. It is for this reason that the top down, market-based approach described later is superior.

### I.   How STOLI Transactions of this Type can Impact Policy Pricing

76.     Life insurance pricing involves numerous factors and decisions by company actuaries, but these four pricing components are key:
1. Mortality charges
2. Interest credits
3. Expenses
4. Lapse rates

77.     These components are mixed by insurance actuaries in innumerable ways to develop different versions of the same generic policy as well as products with special attributes, thereby rendering them more relevant to certain target markets and uses. Each pricing component and its variations are based on actual experience, usually from the insurance company itself.

78.     **The Mortality Component.** That mortality is a component of life insurance pricing is self evident. It is the job of actuaries to estimate the future likelihood of paying death claims under policies and devise an equitable means of assessing each policy for its proportionate share of these claims. Insurance companies develop products to be relevant and appeal to different target markets. These markets can vary enormously one from the other and so too can their mortality experience. For example, we know that individuals with low incomes and net worth do not live as long on average as those of moderate incomes or net worth, and that individuals of

still higher incomes and net worth live longer still.[32]  Stated bluntly, mortality experience under policies targeted and priced for the affluent market, such as in estate planning cases, would reasonably be expected to be better than mortality experience of policies targeted to low income customers.  Actuaries know this fact and would price these two types of policies differently based on expected mortality differences.

79.     Thus, life insurance companies will incur losses from having to pay more in death claims than they priced into their policies because more insureds die earlier in situations when policies were procured through misrepresentations about the insured's wealth, as in this case.  However, the situation is more than just experiencing higher mortality rates because of differences in financial status.  It can be thought of in this way.  If some insurance company decided that it wanted to sell STOLI-driven policies, what mortality rates should it assume in deriving its prices, knowing that (1) the parties purchasing the policies are doing so as wagers on human life, (2) because of no or doubtful insurable interest, ultimate and possibly short-term beneficiaries prefer and profit more if insureds die sooner rather than later, and (3) the insurance amounts issued are grossly in excess of the insurable values of the insureds?  How do they price for this moral hazard that can range from the extreme of murder to the more benign "death by neglect"?[33]  They cannot.  This is the reason why we cannot conduct a credible calculation using STOLI mortality data.  To my knowledge, such data do not exist.  Nonetheless, this is the first of the four potential sources of losses to life insurance companies that unknowingly sell high-value STOLI policies to poor insureds.

80.     **The Interest Component.**  Policies of the type in this case have cash values – internal savings – that arise from premium payments being greater than the internal mortality and expense charges and from the insurance company's investment earnings.  The difference between the insurance company's actual investment return and the interest credited to its policies is called the interest margin or spread.  This **interest margin** is built into original policy pricing and may be intended to cover unexpected contingencies, to recover expenses incurred under the policy, to be a source of insurance company profit, and/or for other corporate purposes.  Obviously, the greater the investments backing policy liabilities, the greater can be an insurance company's interest margins.

---

[32] The gap in life expectancy within the general population appears, in fact, to be widening.  See, e.g., Robert Pear, "Gap in Life Expectancy Widens in the Nation," *The New York Times*, March 23, 2008.

[33] Interestingly, the day that I finalized this report, *The Wall Street Journal* (Leslie Scism and Mark Maremont, "Life, Death and Insurance: Indiana's $15 Million Mystery," April 12, 2010), ran a front-page story of a $15.0 million STOLI policy purchased in 2006 whose owner in 2008 apparently was running out of funds to pay premiums.  The *Journal's* description of STOLI, its issues, and how insurance companies are duped will be familiar to any reader of this report.  In this story, the elderly insured was found dead and fully clothed in her bathtub.  Circumstances surrounding her death were reported as suspicious, including that the much younger policyowner/beneficiary spent the evening with her at a bar where the she became intoxicated; that he was the last person see her alive, escorting her home from the bar and into her house; that he had debt problems; and that the purpose for the insurance ("estate planning") and the insured's net worth are alleged to have been misrepresented in the application.  The owner denied having anything to do with the insured's death.  However, one could imagine a scenario in which an owner of a large STOLI policy, unable to find a buyer for his policy in 2008 and unable to continue the very high premium payments, wanted to protect his multi-million dollar "investment."  What might the owner do?  [As a perhaps interesting aside, the secondary life market was quite soft in 2008, as defendant in this case has observed (discussion with Charles Kleinberg of April 12).  In fact, he was unable to sell three of the policies insuring the life of his wife's grandmother during this period.]

81.     Insurance companies prefer owners of flexible premium policies to pay comparatively "high" premiums so as to have greater earnings from interest margins. Actuaries have experience as to the amounts that are paid under flexible premium policies, and they price policies based on that experience. All of the policies in this case are flexible premium contracts under which the owner can elect to pay "low" or "high" premiums or anything in between.

82.     Purchasers of ordinary (non-STOLI) life insurance policies often elect to pay higher premiums to cause the buildup of higher cash values on a tax preferred basis, which can be used for retirement and other "living" purposes. Actuaries price in anticipation of policyholders' doing this. STOLI conspirators routinely elect to pay low premiums as they have no desire to build higher cash values; their sole interest is in the death benefit payment. In consequence, an insurance company's book of business for these policies is skewed toward lower investments because of STOLI and, therefore, toward lower earnings from interest margins than those anticipated in original policy pricing.

83.     **The Expense Component.**   Insurance companies obviously incur expenses in the marketing, underwriting, and various other processes necessary for the successful prosecution of their business. These elements are appropriately charged against the policies to which they relate. STOLI transactions, however, have caused insurance companies to incur higher expenses than those priced into their policies.

84.     First, insurance companies have had to expend ever more resources in connection with underwriting in an effort to ferret out STOLI-driven applications. Second, insurance companies typically seek to rescind STOLI policies if they discover them, particularly if discovered during the period of contestability. Rescissions are expensive because of the investigative and legal expenses to defend the rescission, and because the insurance company must refund the entire premiums paid and may not retain any portion to recover its underwriting or any other costs. Certainly, the insurance companies involved in this case must have incurred and will continue to incur significant expenses because of these and other STOLI policies.

85.     **The Lapse Component.**   Lapse (voluntary policy termination) rates are directly relevant to life insurance policy pricing, because the assets that insurance companies accumulate from having sold a block of policies rarely equal the liabilities that arise from those policies. When the accumulated assets arising from a group of policies are allocated proportionately among those policies, we get each policy's share of assets or what is called its **asset share**.

86.     If a policy is surrendered (terminated) and its asset share is less than the cash value that must be paid to the policy owner, the surrender imposes a cost on the insurance company. Conversely, if the asset share is greater than the cash value, the surrender results in a gain for the insurance company – called a **surrender gain**. In general, the higher the *early-year* lapse rates for policies, the greater the costs imposed on the insurance company, because the cash values that it has to pay out under policies that lapse are greater than the assets it will have accumulated to support them. It is for this reason that life insurance companies typically lose money in the early years of policies.

87.     Reverse situations also exist in the marketplace in which the asset share exceeds the cash value at some future time. In general, actuaries price policies such that their asset shares during *later* policy years are intended to be greater than cash values. In these instances, each policy that lapses results in a surrender gain to the company in an amount equal to the difference between

the asset share and cash value. These expected surrender gains allow the actuary to lower the original policy pricing below that which it would have been assuming no later-year lapses.

**88.** At some point, STOLI policies sold in the secondary market typically become owned by investors who will have purchased many legitimately acquired policies as well as STOLI policies to form a portfolio of policies. These investors have no intention of allowing the policies to lapse by not paying premiums or to surrender them for their cash value. This defeats the very reason for their purchase in the first place.

**89.** Thus, STOLI policies will not lapse; i.e., lapse rates can be expected to be zero. Any surrender gains anticipated will not materialize on these policies, so actual experience will differ from that originally priced into the policies. The insurance company will suffer losses equal to surrender gains that failed to be realized.

## 2. Putting it all Together

**90.** While I am unable to offer an actuarial quantification of the above components, my hope is that the logic offered for how insurance companies lose money when they unknowingly sell STOLI policies of the type in this case will prove useful to the Court as it considers these insurance companies' losses. Actuarial logic strongly supports the view that such losses not only are real but also large. Life insurance company pricing, across the board, is adversely affected by STOLI transactions of this type.

**91.** Along these same lines, sight should not be lost of the simple fact that life insurance companies across the entire spectrum refuse knowingly to issue STOLI-driven policies. They do this as they recognize that these policies impose costs on them, even if they cannot measure that cost.

## C. The Differences between the Values of the Deals: An Economic Approach

**92.** While I am unable to quantify the losses likely incurred by the insurance companies following a bottom-up actuarial approach, a superior top-down economic or market-based approach to valuing their losses can be suggested. It begins with the simple observations that no rational purchaser of a life insurance policy in the secondary market will pay more than necessary for the policy. The price must be sufficiently high to induce the owner to sell the policy and sufficiently low to allow the purchaser a reasonable profit. Doing so requires an analysis by actuaries in the secondary market akin to that in which the insurance company's actuaries engaged in pricing the policy for the primary market; i.e, taking into consideration the policy pricing components discussed above. Thus, they must consider likely future mortality rates; their expenses, including the policy purchase price and future premium payments; and their time value of money. They may safely ignore lapse rates.

## 1. Establishing the Secondary Market Expected Price

**93.** In considering these factors, purchasers on the secondary market are placing an economic value on the combination of the losses that they impose on and the gains that they confiscate from unwitting insurance companies. They are, in effect, monetizing via STOLI ruses and lies, then confiscating these amounts from the companies. As to this case, the amount that a purchaser on the secondary market was willing to pay for one of the policies at the time it was issued to the defendant is a reasonable proxy for the difference in fair market value between the

policy that the company thought it was selling to the defendant and the very different market value of the policy that the defendant knew that he was buying from the company. In other words, on the day that the defendant purchased the policy from the insurance company, the prices being offered in the secondary life market can be considered as the market placing a value on the differences between the deal that the company thought that it was entering and the deal into which it actually entered; i.e., on the company's losses.

94.     Thus, we need to have some idea as to what STOLI "investors" in 2005 would have reasonably expected to realize in 2007 from the sale of their ill-gotten policies. I believe that a conservative estimate of their expected prices can be fairly based on what policies in this case actually sold for in 2007. Here is why. In 2005, life insurance companies were in the early stages of realizing that they were being victimized by STOLI promoters/investors.[34] By contrast, the promoter/investors were fully engaged by that time and, from their perspective, achieving great success with little risk. The reasonable expectations of the investors at that time were that, if they were successful in duping the insurance underwriters into issuing the policy, they more or less were "home free."

95.     Thus, if the insured did not die during the period of contestability, investors fully expected to be able to sell their policies for a handsome profit. They had some idea of that profit because the life settlement market was already well established at that time, just less populated with STOLI policies than is likely the situation today.[35] Promoter/investors had already engaged actuaries to estimate the value of policies to be sold in the secondary market.

96.     By 2007, the secondary market was beginning to soften with the beginning of the 2007-09 recession, more aggressive actions by life insurance companies in combating STOLI, and a rise in interest rates from those prevailing in 2005[36], among other reasons. Additionally, questions were emerging as to whether life settlement firms were paying too much for their policies.[37] The effect was that secondary market pricing – and therefore STOLI pricing – was less favorable in 2007 than it was in 2005. Therefore, a credible hypothesis is that the sales

---

[34] Searches of the archives of *National Underwriter, Life & Health edition* for STOLI or its equivalent terms SOLI, IOLI, and SPIN Life revealed the earliest reference to be a September 13, 2004 reporting of a LIMRA International Forum (Warren S. Hersch, "Keeping a Wary Eye on the Storm Clouds"). Articles began appearing more frequently as from mid-2005 or so, going into 2006. In contrast, the oldest references to the more established terms viatical and life settlement were March 4, 1996 ("The Viatical Industry is Coming of Age Financially") and January 3, 2001 ("Coventry Center to Offer Life Settlement Seminars"), respectively. *National Underwriter* is a popular weekly insurance news magazine known for its reporting currency on issues.

[35] Estimates of the size of the secondary market in 2005 vary widely because of its diversity and lack of uniform reporting requirements. For example, Moody's quotes Bernstein Research as estimating the market for 2005 at about $13 billion. ("Psst! Wanna Buy a Used Life insurance Policy? Life Settlements: Where Life Insurance Meets the Capital Markets," Moody's Investor Service, Feb. 2006, p. 3) The Institutional Life Markets Association quotes a Conning Research study that the market was $5.5 billion in 2005 in terms of face amount sold. (www.lifemarketsassociation.org/markets_settlement.cfm) Either set of figures suggests that the market was large in 2005.

[36] Rates on AAA corporate bonds increased from 5.23 to 5.56 percent and on BBB bonds from 6.06 to 6.48 from 2005 to 2007 (www.federalreserve.gov/releases/h15/data/Annual/H15_BAA_NA.txt). Prevailing interest rates are important drivers of policy pricing in the secondary market. The higher the prevailing rates, the lower will be prices, *ceteris paribus*, because future projected cash flows will be discounted at higher rates, yielding lower present values.

[37] Joseph M. Belth, "Observations on Reports Filed in Texas by Coventry First and Life Partners," *The Insurance Forum* (November 2007), p. 325.

prices on the six policies that defendant sold in 2007 were no higher than the prices that the defendant had reason to expect in 2005 that he would realize in 2007. This hypothesis receives direct support from the fact that the defendant was unable to sell three of the nine policies in 2007-08.[38] Thus, use of 2007 actual sales prices as proxies for prices that the defendant in 2005 expected from sales in 2007 yields conservative estimates of his 2005 gain expectations.

### 2. Measuring the Defendant's Expected Gain

97.     Here I offer one way by which the Court can establish the value of the insurance companies' losses following a market-based, economic approach. This variation views the losses (defendant's gain) from what might have been the defendant's reasonable expectations in 2005 when he purchased the nine policies. At that time, he had successfully duped the four life insurance companies into issuing nine policies, so it seems reasonable to believe that he harbored an expectation of being "home free." He either would make a windfall profit on Mrs. Eckstein's early death or a smaller but still massive one by selling all nine policies in the secondary market.

98.     We know that he sold six of the policies and that he lapsed one policy (John Hancock). I am informed that he gifted two New York Life policies to charities.[39] The chart below shows the gains and related data for the six policies that he sold. The chart also shows for each of the six policies (1) the return on investment (ROI), (2) the ratio of the sales prices to the face amounts, and (3) ratio of the gains to the face amounts. The averages of these measures is used to project expected gain – as viewed from 2005 – on the other three policies. Of course, that one policy was lapsed in 2008 and that two were donated to charity is irrelevant in terms of what the defendant's expectations were in 2005. He bought all nine policies to be sold in the secondary market.

---

[38] Discussion with Charles Kleinberg of April 12, 2010.
[39] *Id.* Presumably, he received an income tax deduction based on the market value of the policies.

## Defendant's Actual and Projected Gains on Nine Policies Insuring Helena Eckstein

| Insurance Company | Policy No | (A) Face Amount | (B) Premiums Paid | (C) Sales Price | (D) [(C)-(B)] Gain | [(D)/(B)] ROI | (C)/(A) Sales Price/Face Amt | (D)/(A) Gain/Face Amount | Status |
|---|---|---|---|---|---|---|---|---|---|
| **Actual Gains** | | | | | | | | | |
| Lincoln Life | LF-5513692 | 250,000 | 22,510 | 67,500 | 44,990 | 199.9% | 27.0% | 18.0% | Sold |
| Lincoln Life | LF-5513690 | 1,000,000 | 90,040 | 270,000 | 179,960 | 199.9% | 27.0% | 18.0% | Sold |
| Lincoln Life | LF-5513686 | 3,750,000 | 337,649 | 1,012,500 | 674,851 | 199.9% | 27.0% | 18.0% | Sold |
| MetLife | 7456944 | 5,000,000 | 253,851 | 1,350,000 | 1,096,149 | 431.8% | 27.0% | 21.9% | Sold |
| MetLife | 7456941 | 5,000,000 | 260,000 | 1,350,000 | 1,090,000 | 419.2% | 27.0% | 21.8% | Sold |
| NY Life | 56734523 | 5,000,000 | 455,158 | 1,850,000 | 1,394,842 | 306.5% | 37.0% | 27.9% | Sold |
| Totals/averages - actual | | 20,000,000 | 1,419,208 | 5,900,000 | 4,480,792 | 315.7% | 29.5% | 22.4% | |
| **Projected Gains** | | | | | | | | | |
| NY Life | 56734522 | 5,000,000 | 325,000 | 1,351,025 | 1,026,025 | 315.7% | 27.0% | 20.5% | Unknown |
| NY Life | 56734521 | 2,500,000 | 150,000 | 623,550 | 473,550 | 315.7% | 24.9% | 18.9% | Unknown |
| John Hancock | 59 609 107 | 5,000,000 | 650,000 | 2,702,050 | 2,052,050 | 315.7% | 54.0% | 41.0% | Lapsed |
| Totals - ROI | | 12,500,000 | 1,125,000 | 4,676,625 | 3,551,625 | | | | |
| NY Life | 56734522 | 5,000,000 | 325,000 | 1,475,000 | 1,150,000 | 353.8% | 29.5% | 23.0% | Unknown |
| NY Life | 56734521 | 2,500,000 | 150,000 | 737,500 | 587,500 | 391.7% | 29.5% | 23.5% | Unknown |
| John Hancock | 59 609 107 | 5,000,000 | 650,000 | 1,475,000 | 825,000 | 126.9% | 29.5% | 16.5% | Lapsed |
| Totals – sales price to face amt | | 12,500,000 | 1,125,000 | 3,687,500 | 2,552,500 | | | | |
| NY Life | 56734522 | 5,000,000 | 325,000 | 1,445,000 | 1,120,000 | 344.6% | 28.9% | 22.4% | Unknown |
| NY Life | 56734521 | 2,500,000 | 150,000 | 710,000 | 560,000 | 373.3% | 28.4% | 22.4% | Unknown |
| John Hancock | 59 609 107 | 5,000,000 | 650,000 | 1,770,000 | 1,120,000 | 172.3% | 35.4% | 22.4% | Lapsed |
| Totals – gain to face amt | | 12,500,000 | 1,125,000 | 3,925,000 | 2,800,000 | | | | |

**Defendant's Actual plus Expected Gain**

| | |
|---|---|
| Using ROI Averages | 8,032,417 |
| Using Sales Price to Face Amt Avg | 7,043,292 |
| Using Gain to Face Amt Avg | 7,280,792 |

99.    Defendant realized $5.9 million in gross revenues from the sale of the six policies. He paid premiums totaling only $1,419,208. His profit, therefore, was $4,480,792. Stated differently, for the six policies actually sold, defendant averaged receiving more than four dollars for every dollar invested in them. His profit converts to an average return on investment (ROI) of an amazing 315.7 percent, with individual ROIs varying from a low of 200 percent to a high of 432 percent. For comparison, using the average annual long-term returns in the stock market, an investor would have had an ROI of less than 20 percent over any random two-year period. The average sales price of the policies equaled 29.5 percent of their face amounts, and the average gain was 22.4 percent of their face amounts.

100.    In the lower half of the chart, I apply the average of each of these measures to the face amount and premium figures for the policy that lapsed and for the two policies that were donated. I thereby derive an estimate for what the gains would have been on these policies had they, in fact, been sold in the secondary market at the averages realized for the six policies that were sold. Recall that the underlying perspective here is that of the defendant in 2005 and not the perspective from today.

101.    The application of each measure results in a different projected gain to the defendant (loss to the insurance companies). I include three measures to provide the Court with alternative approaches for viewing the same transactions. As the chart shows, total actual and projected gains using the three measures would have gains (losses) vary from a low of somewhat more than $7.0 million to just over $8.0 million. Thus, had defendant sold all nine policies and averaged a return on his investment of 315.7, the same as that which he averaged on the sale of the six policies, his gain (and the insurance companies' losses) would be valued at $8.03 million. Had he averaged receiving in gross revenues 29.5 percent of all nine policies' face amounts, the same percentage as he averaged receiving from selling the six policies, his gain (and companies' losses) would be valued at $7.04 million. Finally, had his gain on selling all nine policies averaged the same percentage of face amount as that which he averaged on the sale of the six policies, his gain (and company losses) would be valued at $7.28 million. In economic and actuarial terms, ROI is the most relevant measure.

### 3. Measuring the Defendant's Actual Gain

102.    The other top-down, economic approach to quantifying the loss to the insurance companies is to use the defendant's actual gain. Again, this approach takes the position that the profit realized in STOLI sales of this type is the economic equivalent of the secondary market placing a value on the combination of losses imposed on and gain captured from the insurance company because of STOLI; i.e., the difference between (1) the policy's fair market value as (incorrectly) assessed by the company at the time it sold the policy in the primary market and (2) the policy's greater fair market value as known by the STOLI investor in the secondary market.

103.    The above chart shows the total sales price or gross revenue of $5.90 million realized for the six policies that were sold. It also shows that premiums in the amount of $1.42 million were paid on these policies and in the amount of $1.12 million were paid on the other three policies, for a total of $2.54 million. The difference, therefore, between the $5.90 million in gross sales revenue realized from the six policies that were sold and the $2.54 million in premiums paid for all nine policies is $3.36 million.

104.    This figure is a reasonable measure of the life insurance companies' losses if the Court's focus is on the gain actually realized in the secondary market by the defendant as opposed to the

gain expected in 2005. (As explained below, however, it is arguably inferior to the approach of using expected gain.) The actual gain can also be considered as representing the difference in value between the deal that the defendant knew he was marking with the misinformed insurance companies and the deal that the insurance companies believed they were entering. It can be thought of as the market's economic valuation of the difference in value between the two deals, which is a combination of the cost that the defendant imposed on and the gain that he confiscated from the insurance companies.

**105.** The gain that the defendant expected to realize in 2005 is, however, the better proxy for the actual economic loss that the insurance companies suffered in 2005. The defendant's expected gain in 2005 as derived in paragraphs 97-101 is a conservative market value measure of the difference between the fair market value of the policies that the insurance companies attached to the policies that they were selling and the higher fair market value that the defendant knew that he could realize by buying the policies from the companies. It is a measure of the insurance companies' actual losses when they suffered them in 2005. The 2007 actual results reflect a different, softened secondary market from that which prevailed in 2005, as explained in paragraph 96, and is not a faithful reflection of that market. Thus, what the defendant expected to gain in 2005 is a better measure of the actual loss to the insurance companies in 2005 than that of 2007 actual results.

## VII.   Conclusion

**106.** Three approaches can be taken to place a value on the losses suffered by the insurance companies because of defendant's actions in this case. The first approach views this value as being that of a person hoping for the most financially lucrative "win" scenario – the early death of the insured. This valuation approach seems most appropriate given the defendant's expressed view that it would constitute "a grand slam." In this instance, the loss could be estimated as the difference between the policy death benefits and a maximum of two years' premium payments.

**107.** The second approach views the loss as being the actuarial value of the higher death claims, lower investment earnings, higher expenses, and/or lower surrender gains because of the defendant intentionally misleading the insurance companies as to the deal that they entered. While this approach provides a conceptually sound way of approaching a bottom-up analysis, data limitations preclude its actual calculation.

**108.** The third approach takes the position that expected and actual profits realized by the defendant in connection with, first, the expected sale and, second, the actual sale of the policies can be considered as the market placing an economic value on the losses imposed by defendant on the insurance companies and confiscated by the defendant. As the defendant would have had a strong basis for the belief in 2005 that he could easily sell all nine policies in 2007, the first of the two offered approaches seems the second best valuation approach, with the actual valuation approach falling third.

**109.** The defendant, through the *Sentencing Memorandum* and its quoting from the *Gober Report*, made several assertions which, if accurate, would mitigate if not eliminate the losses as I have set out above in the three approaches. All of the assertions were analyzed and are misleading, inaccurate, and/or unsupported. STOLI is most assuredly not just another form of life settlements. It involves an explicit effort at misrepresentation. I am unaware of any life insurance company that will knowingly approve a STOLI-driven application, and I am aware of

many that explicitly will not approve them.  Finally, assertions to the effect that life insurance companies actually care either little or not at all about proposed insureds' net worth is demonstrably wrong.

**110.**   The defendant made millions in ill-gotten gains from the purchase then sale of policies insuring the life of his wife's grandmother.  He protests that he had no intention to and did not impose any losses on the duped life insurance companies.  His protestations are demonstrably wrong.  We have, in a sense, but to ask ourselves "from where did he believe the millions in profit ultimately came?"

_____

Harold D. Skipper

_____

Date

**Exhibit A:  Material Relied Upon in Preparation of this Report**

(See footnotes for additional material relied upon in preparation of this report)

- *Anderson on Life Insurance*, Little, Brown and Company, 1991, Buist M. Anderson [hereinafter, Anderson];

- *Life and Health Insurance*, 13th ed., Prentice-Hall, Inc., 2000, Kenneth Black, Jr. and Harold D. Skipper [hereinafter, Black and Skipper];

- *Life & Health Insurance Law*, 8th ed., Irwin McGraw Hill, 1998, Muriel L. Crawford [hereinafter, Crawford];

- *Risk Management and Insurance: Perspectives in a Global Economy,* Blackwell Publishing, 2007, Harold D. Skipper and W. Jean Kwon [hereinafter, Skipper and Kwon];

- Swiss Re Financial Guidelines;

- *Sentencing Memorandum Submitted on behalf of the Defendant, Edward Vaysman* dated March 21, 2010 [hereinafter, *Sentencing Memorandum*];

- Thomas D. Gober, *Report for John Mitchell, Esq. in the Matter of United States v. Edward Vaysman* dated October 29, 2009 [hereinafter, *Gober Report*]; and

- Documents provided by New York Life, Lincoln Financial, MetLife, John Hancock Life, and Cambridge Settlement pursuant to subpoenas.