

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

F.#2009R00082

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

October 4, 2010

<u>By ECF</u>

The Honorable I. Leo Glasser
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

            Re:  United States v. Edward Vaysman
                 <u>Criminal Docket No. 08 CR 466 (ILG)</u>

Dear Judge Glasser:

        The above defendant is scheduled to have a Fatico
hearing and be sentenced on October 7, 2010.  The government
writes in response to the defendant's Reply Sentencing Memorandum
dated May 5, 2010 ("Def R Mem") and in further support of the
position which it took in the Government's Original Sentencing
Memorandum dated April 14, 2010 ("Govt Mem").  The defendant, in
Def R Mem, misrepresents the facts, the law and the government's
position.  Before reviewing Def R Mem in any depth, the
government will set forth three dispositive points in support of
the government's position on the defendant's guideline level
which the defendant ignores.

        <u>Point One</u>  The defendant certainly lied to the
insurance companies about the defendant's wife's grandmother's
("Eckstein's") non-existent net worth.[1]  But the defendant's

_____

        [1] Eckstein is penniless.  The defendant falsely stated to
each of the four insurance companies from which he purchased
insurance on Eckstein's life that Eckstein's net worth was in the
millions.  His misrepresentations about Eckstein's net worth went
from a low of $34 million on applications to Jefferson Pilot in
April 2005, Ex. 5 (annexed to Govt Mem), to a high of $62 million
on applications to New York life just four months later in August
2005, Ex. 9 (annexed to Govt Mem).  The defendant's signature
appears directly below the typed entries on each of these
applications listing Eckstein's net worth as, respectively, $34
million (Ex. 5) and $62 million (Ex. 9).

assertions to the contrary notwithstanding (Def R Mem at 3), he <u>also</u> lied to the insurance companies about the fact that his applications to insure Eckstein's life were applications to obtain STOLI policies.[2]  The insurance companies asked the defendant what the "purpose" of each of the Eckstein policies was. The defendant repeatedly lied in answering those questions by falsely telling the insurance companies that his "purpose" in applying for insurance on Eckstein's life was "estate liquidity and conservation" or "estate preservation", <u>see, e.g.</u>, Ex. 7 (page 3) and Ex. 9 (first page).  The defendant never truthfully answered the insurance companies questions by telling them that the "purpose" that he and Ari Schonbrun (the defendant's secret, stranger 1/3 partner) had, was to purchase STOLI policies on Eckstein's life with the intent of either collecting their full face values within two years (as a result of Eckstein's early death), or, after two years, selling the policies at a large profit.[3]

        <u>Point Two</u>  Each of the defendant's two lies to the insurance companies, namely, (1) his lie about Eckstein's net worth and (2) his lie about the purpose of the policies for which the defendant was applying, was the direct cause of the insurance company's decision to issue any insurance at all on Eckstein's life, or, at the very least, the direct cause of the insurance company's decision to issue anything more than very minimal life insurance on Eckstein's life.  Put the other way, had the insurance companies known the truth of either of the above facts about which the defendant lied, they would not have issued anything close to the $32.5 million in life insurance that they did issue on Eckstein's life, and, if they had known that the defendant was seeking STOLI policies on Eckstein's life, they would not have issued any insurance at all on Eckstein's life.

        This point is not seriously in doubt, even based solely upon the papers that have been submitted to date.  The table in the report of the government's highly credentialed expert, Dr. Harold Skipper (Govt Mem, Ex. 2 (hereinafter "Skip Report") at ¶¶ 20-22, pages 5-7), shows the guidelines that major insurance

_____

        [2]  A STOLI policy is a policy procured through lies with the intent, at inception, of later being sold on the secondary market.

        [3]  The evidence that the government will present at the Fatico hearing will show that it is not true that the defendant was an unwilling dupe of unscrupulous insurance agents when he purchased these STOLI policies.

companies use to determine how much life insurance to issue on
estate preservation policies as a percentage of the insured's net
worth.  Eckstein is essentially penniless, has no will because
she has no estate to leave to her family members, has a perennial
bank balance of $250 at the end of each month and has a net worth
of, at most, a few thousand dollars.  The table in the Skip
Report, cited above, contains the guidelines used by the highly
influential Swiss Reinsurance Company concerning the amount of
life insurance it will issue on estate preservation policies, <u>as
a percentage of net worth</u>.  Many insurance companies follow the
Swiss Re guidelines or pattern their own guidelines after the
Swiss Re guidelines in using the insured's net worth to compute
the amount of insurance it will issue for estate preservation
purposes.  Skip Report ¶22.  Under the Swiss Re guidelines, the
amount of life insurance to issue for estate preservation
purposes is arrived at by (1) accumulating  the insured's present
net worth by an interest rate of 5-10% per year for ten years or
the insured's life expectancy, whichever is smaller; and (2) by
then multiplying the number arrived at in "1" first by 75% and
then by 50%.  Beginning with a present net worth for Eckstein of
approximately $2,000 and maximizing the final result by
increasing 75% of that figure by 10% per year for a full ten
years results in a Swiss Re guideline of issuing Eckstein life
insurance for estate preservation purposes of less than $2,000,
rather than $32.5 million.[4]

     Further, as noted above, when the insurance companies
asked the defendant what the purpose was for which he sought
insurance on Eckstein's life, he was required to inform the
insurance company that the purpose was to obtain a STOLI policy
for investment purposes.  Instead, he lied and answered "estate
preservation."  As seen by the significant steps taken by the
insurance companies involved in this case, and by the insurance
industry in general, to rescind and not to issue STOLI policies,
Govt Mem at 27-30, if the insurance companies had known the true
purpose of the policies for which  the defendant applied, they
would have denied the applications and issued <u>no</u> insurance on
Eckstein's life <u>in any amount</u>.

     <u>Point Three</u> The defendant's fraud in telling the
foregoing lies to the insurance companies was the direct cause of
<u>actual</u> economic loss to the insurance companies.  The defendant's

---

     [4]  In fact, since Helena Eckstein has no taxable estate, no
insurance company would issue an estate planning policy on Helena
Ecxkstein's life in any amount.  The Swiss Re guidelines are only
intended to apply to insureds who have a taxable estate.

lies caused the insurance companies to issue policies they would not have otherwise issued and to therefore incur very large initial outlays of money and resources.  The premiums that an insurance company charges - - which are the insurance company's means of paying death benefits, recouping its expenses and making profits - - are based upon a number of factors, using facts about the relevant population to which the insured belongs.  Whether a particular person who falls in a population that, on the average, has an increased risk of premature death will in fact die prematurely  is not something that is known for that particular individual.  Some insureds with a particular disease will die prematurely and others will not.  But if actuaries have good statistics about the average death rates of the relevant population <u>as a whole</u>, they can increase the premiums for all insureds in that population so that the insurance company can expect to make a reasonable profit on the class of all policies it writes for insureds in that population, even though it will lose money on some of those individual policies.  If there is no adequately available data for the relevant population, as there is not for the STOLI population, then underwriters will not knowingly insure persons from that population, because they cannot assess how much larger a premium to charge so as to make a reasonable prediction of how to make a reasonable profit on the policies that are issued for the relevant population as a whole. That is the standard way in which actuaries and underwriters decide the appropriate premiums to charge for life insurance policies.

    If the insurance companies had somehow been forced to sell the Eckstein policies with knowledge that they were STOLI, rather than being tricked into selling them without knowing that they were STOLI, then the insurance companies would have charged much higher premiums on these policies than they did charge.  The economic loss to the insurance companies when they were tricked into selling the Eckstein STOLI policies was that they were deprived of the ability to set the premiums they would receive at an appropriate rate to adequately protect their economic interests.

    Although insurance companies will not knowingly issue STOLI life insurance policies because of inadequate statistics about the STOLI population as a whole, insurance companies are, nonetheless, tricked through fraud into unknowingly selling many STOLI policies.  As noted above, the premiums an insurance company charges on a policy on the life of any two insureds from the same population are identical.  An insurance company can only take a reasonable risk by selling to any single insured from a relevant population, call him A, by setting premiums for all insureds from that population high enough so that it has a reasonable expectation of making a reasonable profit on the

policies from that population as a whole, even though it will lose money on many individual policies from that population (and may lose money on the policy it issues to A).

If an insurance company had somehow been forced to knowingly sell all of the policies from the STOLI population that it has in fact been tricked into selling, then the insurance company would have set higher premiums for all those policies in an attempt to make a reasonable profit on the STOLI policies as a whole, even though it would still lose money on individual STOLI policies. The loss that the insurance companies suffered from the defendant's fraud is the higher premiums it did not collect on the Helena Eckstein policies to ameliorate the unreasonable risks of loss it has taken on the population of unknown STOLI insureds as a whole that it was tricked into insuring. To fully ameliorate these losses, it would have to identify and collect the higher premium amounts from all STOLI policy owners to whom it has unknowingly sold. The defendant's guideline range cannot be calculated based on the lower premiums it has charged on all STOLI policies it has unknowingly issued. However, the portion of the insurance company's losses attributable to the Eckstein policies are the higher premiums it would have charged just on the Eckstein policies if it had somehow been forced to sell the Eckstein policies with knowledge that they are STOLI.

The insurance companies would have charged much higher premiums irrespective of whether the defendant, when he purchased the policies, in fact, had any intention of causing Eckstein to die early - - the insurance company cannot determine, one way or the other, for a particular STOLI policy owner whether or not he will in fact act on the increased risks associated with the STOLI population. The insurance companies would have charged higher premiums for their own economic protection and pursuant to routine underwriting pricing principles, which price premiums based upon the increased risks in the relevant population as a whole. Thus, the defendant's lies caused the insurance companies to charge far lower premiums than they would have charged if they had known the truth about the defendant's lies and were somehow forced to issue the Eckstein policies.

The different reasons that the defendant's lies caused the premiums on the Eckstein policies to be lower than they would have been if the companies had known the truth are summarized in Govt Mem at 41-45 and include: (1) the fact that wealthy persons live longer than penniless persons, allowing insurance companies to charge lower premiums for wealthy persons; (2) the fact that pricing assumptions about lapse rates, which allow insurance companies to charge less for non-STOLI policies, do not apply to

STOLI policies; (3) the fact that non-STOLI policy owners can be expected to pay above the minimum flexible premium rate, which allows insurance companies to charge less for non-STOLI policies, whereas a STOLI policy owner cannot be expected to do so; and (4) as mentioned above, the increased premature death risks that are inherent (in an unknown amount) among the STOLI population as a whole.

The issue in this case is how much the insurance companies lost by issuing policies they would otherwise not have issued.  The insurance companies were entitled to receive the premiums they would have charged and which they thought they needed to charge at the outset to protect themselves against loss.  The defendant lied to the insurance companies and as a direct result of those lies the insurance companies were duped into issuing the Eckstein policies and charging premiums on those policies that were too small to adequately protect them against loss.

However, because there is no adequate data on the STOLI population, there is no adequate way to determine from the bottom up the appropriate premiums to charge on STOLI policies. Nonetheless, as shown in Govt Mem at 24-26, the profits the defendant intended to make by selling the Eckstein policies on the secondary market constitute a reasonable estimate of the difference between the deal that the insurance companies thought that they were entering into - - selling policies on a wealthy elderly person for estate planning purposes - - and the very different  deal that the defendant knew that the insurance companies were entering into - - selling STOLI policies for investment on the life of a penniless person.  The amount of profit that the defendant intended to make on the secondary market from selling the Eckstein policies was between $7 and $8 million.

That $7 to $8 million figure is a reasonable estimate of the difference in fair market values between the deals the insurance companies thought that they were entering into and the different deals that the defendant knew that he had duped them into entering into.  Fair market values are an appropriate factor under the Sentencing Guidelines upon which to estimate loss. U.S.S.G. § 2C1.1, App. Note 2(C)(I).  The difference in fair market values, which caused lower income to the insurance companies, are the actual losses to the insurance companies resulting directly from the defendant's fraud.  An estimate of the difference in these fair market values is what the secondary market was willing to pay for the Eckstein policies in 2005. There is an alternative means of arriving at the same $7 million

to $8 million loss/gain amount as the appropriate to use in
computing the defendant's guidelines level.  Under the
Guidelines, if there is a loss, but its size cannot be
determined, then the court "shall" use the defendant's gain in
computing the guidelines.  U.S.S.G. 2B1.1, App. Note 2(B).  If
the circumstances under which the defendant could collect the
full $32.5 million in death benefits did not present themselves
within two years (see below), then the defendant's secondary
intent was to gain $7 to $8 million by selling the policies on
the secondary market.  Govt Mem at 47.  The evidence that the
defendant's intended gain on sale was $7 to $8 million is
difficult to refute.  Govt Mem at 45-47.

        In light of the foregoing three points upon which the
government bases its guideline calculations, responding to the
specific arguments raised by the defendant in Def R Mem is not
difficult.  The defendant claims that the government has not
taken into account the statement in <u>Kramer v. Lockwood</u>, 653 F.
Supp. 2d 354, 379 (S.D.N.Y. 2009) that "Phoenix entered into a
calculated business transaction in which it risked paying a large
death benefit, but stood to gain from years of large premiums.
The damage as alleged by Phoenix here, potentially having to pay
the large death benefits, was not caused by Kramer's alleged
misrepresentation, but was always part of the bargain Phoenix
entered."  But in <u>Kramer</u>, unlike here, there was found to be no
misrepresentation, and here, unlike in <u>Kramer</u>, which was disposed
of on the pleadings, there has been a specific factual showing
that as a direct result of the defendant's lies, the insurance
companies issued policies that they would not have otherwise
issued and charged far less in premiums than they otherwise would
have charged to protect themselves against large losses if they
had known the truth.  Thus, in this case, it has been shown that
the defendant's lies caused the insurance companies to lose
money.

        The defendant argues that the government's position is
mistaken and he poses the following hypothetical in support of
his argument.  The $25 million life insurance policy for elderly
person A, who is really worth $25 million, is sold on the
secondary market after the two year period of contestability has
expired.  At the same time, the $25 million life insurance policy
for elderly person B, who was misrepresented to have a net worth
of $25 million, is also sold after the two year period of
contestability has expired.  The defendant argues that the
likelihood that the purchaser on the secondary market of B's
policy will cause B's early death is no greater than the
likelihood that the purchaser of A's policy will cause A's early
death.  The defendant further argues that the fact that the

original policy on B contained a misrepresentation as to B's net worth does not affect the likelihood that, after the period of contestability has expired, the purchaser of B's policy will cause B's early demise.  Hence, the defendant concludes that a lie about the insured's net worth cannot be the cause of economic loss to the insurance company.

The defendant's argument completely misses the point. In the case of the policy on person A's life, there were no lies, no fraud and therefore, no reason or occasion to compute a guideline range.  In the case of the policy on person B's life, however, there was fraud and a reason to compute a guideline level based upon the inadequate premiums that the insurance company charged as a result of the fraud.

The concern in this case that someone would cause Eckstein's early death is not a concern that some purchaser of one of her policies on the secondary market would do so, but rather the increased risk that, if, during the period of contestability, Eckstein's health were to decline, the defendant would <u>not</u> do everything he could to prevent Eckstein's early death (<u>e.g.</u>, "I hope she doesn't die soon, but if she does, I hope its <u>before</u> I sell the policies on the secondary market on their two year anniversary dates").  <u>See</u> Govt Mem at 39-40. There was a concern in this case about that precisely because of the fact that the defendant and his stranger partner purchased the Eckstein policies for investment - - a fact about which the defendant lied when he falsely told the insurance companies that the policies were for estate planning purposes.  The defendant's own statements to the government support this concern, namely his statement that if Eckstein died before he sold the policies at the end of the periods of contestability then he would win the "grand slam."

However, for the increased risk that the defendant would not do everything he could to prevent Eckstein's death to become a reality, the opportunity would have to present itself. Eckstein's health would have to decline or other circumstances would have to occur that would require significant effort from the defendant for Eckstein to survive.  The defendant's statements to the government did not indicate an intent to murder Eckstein, but rather a willingness, as a means of collecting the death benefits on the Eckstein policies, to not take affirmative steps to keep Eckstein alive if the need for him to take such steps arose.

But if, before the periods of contestability expired, the opportunity did not present itself for the defendant to not

do everything he could to keep Eckstein alive, then the
defendant's lies caused the insurance companies to lose the
higher premiums they would have charged if they had known that
Eckstein was penniless and that the policies were STOLI.  In the
hypothetical that the defendant presents, the lies that were told
to the insurance company about B's net worth directly caused the
insurance company to lose higher premiums both before and after
the policy was sold on the secondary market.  That is because
lies about B's net worth caused the insurance companies to
misunderstand and thus undervalue the deal into which they were
entering.  By contrast, no misrepresentations were made on the
application to insure A.  In the case of the policy on A, the
insurance company did strike the bargain it thought it was
striking; it did set A's premiums at a level which it believed
would adequately protect itself.  Insurance companies do
knowingly sell estate preservation policies with face values of
millions of dollars on the lives of persons who have net worths
of millions of dollars; they do not do so on the lives of persons
who are penniless and for whom their life policy is intended as
an investment.

          The defendant persists in reiterating statements he
made in his original sentencing brief that the government has
already shown to be false.  For example, the defendant asserts,
as he did in his original sentencing papers, that the "New York
Life Insurance Company - which was founded in 1840 and the
largest mutual life-insurance company in the United States[5] and
one of the largest life insurers in the world - and who issued
three of the policies in this case with a total face value of
$12.5 million - never asked a single question about [Eckstein's]
net worth in any of its applications for life insurance."  Def R
Mem at 6.  However, the government has already submitted as an
exhibit to Govt Mem, See Govt Mem, Ex. 9, a one page "Financial
Supplement" to the defendant's New York Life Application, a
document in which New York Life asked the defendant to state
Eckstein's net worth.  In response to that question, the
defendant lied, stating that Eckstein's net worth was $62
million.  The defendant asserts that this one page supplement was
not sent to the defendant until after the New York Life policies
had been issued on Eckstein's life.  Def R Mem at 6, n. 1.  But
that assertion is false.  The New York Life Financial Supplement
on which the defendant lied about Eckstein's net worth was signed

_____

          [5]  As a mutual insurance company, New York Life's profits go
to the owners of the policies New York Life issues, since the
company, like all mutual insurance companies, is owned by the
persons who hold the policies that the company issues.

by the defendant on August 21, 2005.  New York Life did not issue the three life policies on Eckstein until September 6, 2005.

The defendant also states in Def R Mem at 11-12, as he stated in his original sentencing submission, that he never intended to cause any loss to the insurance companies.  In addition to facts to the contrary which the government will present at the Fatico hearing, the defendant is precluded by his guilty plea from arguing that he intended no loss to the insurance companies.  The defendant admitted at his guilty plea that he committed wire and mail fraud against the insurance companies.  But it is well-settled that a defendant cannot commit either of those crimes unless he intends to deprive the victim of his money or property.  <u>United States v. Males</u>, 459 F. 3d 154, 159 (2d Cir. 2006)("the district court's instruction to the jury that '<u>some actual economic harm or injury to the victim must have been contemplated by [Males]</u>,' . . . was an accurate statement of the law." (Emphasis added)).

The defendant states in Def R Mem that he answered all questions at his government proffers truthfully, that he signed the applications to the insurance companies in blank before any of them were filled out and that he saw no misinformation on the applications at the time he signed the applications.  The government will submit evidence at the Fatico hearing that these claims are false.

The defendant makes a number of other false claims in Def R Mem, most of which are not terribly relevant to sentencing.  The government will not respond to these additional false claims here because these claims by the defendant are distractions from the main point, namely that, based solely upon the three crucial facts set forth at the outset of this letter, the government's position on the defendant's guideline level should be accepted.

For the reasons stated above and in Govt Mem, the government contends that the defendant's primary plan, and his primary intent, was, <u>if, and only if, the opportunity presented itself</u>, to cause a loss of over $30 million to the insurance companies (the $32.5 million in death benefits less two years of premiums) before the periods of contestability passed by not doing everything the defendant could to keep Eckstein alive until he sold the policies.  If the Court accepts this figure as the defendant's intended loss to the insurance companies then the defendant's guideline level is level 26.  The defendant's secondary plan was to sell the policies on the secondary market after the periods of contestability passed if the opportunity to collect the face values did not present itself within the periods of contestability.  This secondary plan, which the defendant

effectuated, caused an actual loss to the insurance companies, and alternatively, an intended gain to the defendant, of $7 to $8 million. If the Court accepts this figure as the actual loss or the intended gain then the defendant's guideline level is level 24.  If the Court chooses to use the defendant's actual, rather than his intended, gain of $3.36 million as the controlling loss/gain figure for guideline purposes, See, Govt Mem at 28-29, then the defendant's guideline level is level 22.

Thank you for your attention.


Respectfully submitted,

LORETTA E. LYNCH
United States Attorney


By:  _____/s_____
     Charles Kleinberg
     Assistant U.S. Attorneys
     (718) 254-6012